UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,                                    Indictment No.: 22 CR 395 (ER)


            v.


SETH MARKIN,

                        Defendant.

-------------------------------------------------------------X



**MEMORANDUM OF LAW IN SUPPORT OF SETH MARKIN'S
MOTION TO SUPPRESS EVIDENCE AND FOR OTHER RELIEF**



                                                   SERCARZ & RIOPELLE, LLP
                                                   950 Third Avenue, 31st Floor
                                                   New York, New York 10022
                                                   Telephone: 1-212-586-4900
                                                   *Attorneys for Seth Markin*

# **TABLE OF CONTENTS**

I.      The Defendant's Statement To Agents Of Law Enforcement Must Be Suppressed ....... 1

   A.    The Events Leading To The Defendant's Interrogation ................................................... 2

   B.    Supervisors At The FBI Training Academy Become Actively Involved In The Insider Trading Investigation ................................................................................................... 3

   C.    The Coercive Nature Of The Interrogation .................................................................. 4

   D.    The Events Following The Interview Further Serve To Demonstrate That The Defendant's Decision To Participate In The Interview Was Not Voluntarily Obtained; And, That His Refusal To Participate Would Have Been Followed By His Dismissal From Employment With The FBI ........................................................................ 7

   E.    The Applicable Law ................................................................................................... 9

   F.    The Relief Requested ............................................................................................... 11

II.    Those Counts In The Indictment Charging The Defendant With The Substantive Crimes Of Securities Fraud And Tender Offer Fraud Are Multiplicitous .................... 12

   A.    The Indictment ........................................................................................................ 13

   B.    The Law Regarding Multiplicity .............................................................................. 15

   C.    The Elements Required To Prove The Substantive Counts Of Tender Offer Fraud In This Case Are Identical To Those Required To Prove The Substantive Charges Of Securities Fraud ..................................................................................................... 15

   D.    The Count Charging Securities Fraud In Violation Of 18 U.S.C. § 1348 Is Likewise, Multiplicitous When Compared With The Other Substantive Counts Of Securities Fraud and Tender Offer Fraud ................................................................................. 17

   E.    The Prejudice Arising From The Indictment In Its Present Form ............................... 17

   F.    The Requested Relief ............................................................................................... 18

III.   Conclusion ............................................................................................................. 19

## **TABLE OF AUTHORITIES**

Cases

*California v. Beheler,* 463 U.S. 1121 (1983) ............................................................................. 10

*Chiarella v. United States,* 445 U.S. 222 (1980) .................................................................. 15, 17

*Colorado v. Connelly,* 479 U.S. 157 (1986) ............................................................................. 12

*Dirks v. SEC,* 463 U.S. 646 (1983) ........................................................................................... 15

*Dunn v. United States*, 284 U.S. 390 (1932) ............................................................................ 18

*Garrity v. New Jersey,* 385 U.S. 492 (1967) .............................................................................. 1

*Michigan v. Tucker,* 417 U.S. 433 (1974) ................................................................................. 10

*Miranda v. State of Arizona, 384 U.S. 436 (1966)* ..................................................................... 1

*Rhode Island v. Innis*, 446 U.S. 291  (1980) ............................................................................. 10

*United States v. Alleyne,* 573 F.Supp.3d 861 (E.D.N.Y. 2021) ................................................ 11

*United States v. Bin Laden*, 91 F.Supp.2d 600 (2000) .............................................................. 15

*United States v. Cassese*, 290 F.Supp.2d 443 (S.D.N.Y. 2003) ................................................ 16

*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999) .............................................................. 15

*United States v. Chestman,* 947 F.2d 551 (2d Cir. 1991) .......................................................... 15

*United States v. Dickerson,* 530 U.S. 428 (2000) ..................................................................... 12

*United States v. Kaur*, 2008WL5156582 (E.D.N.Y. 2008) ....................................................... 11

*United States v. Powell,* 469 U.S. 57 (1984) ............................................................................ 18

*United States v. Stein,* 440 F.Supp.2d 315 (S.D.N.Y. 2006)(Stein I) ..................................... 9, 10

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008)(Stein II). .................................................. 10

*United States v. Walsh*, 194 F.3d 37  (2d Cir. 1999) ................................................................. 15

*United States v. Wedd*, 2016WL1055737 (S.D.N.Y.) ................................................................. 12

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008)............................................................. 12

**Statutes**

18 U.S.C. § 1348................................................................................................................................ 14

18 U.S.C. § 2...................................................................................................................................... 14

I.      **The Defendant's Statement To Agents Of Law Enforcement Must Be Suppressed**

In *Garrity v. New Jersey,* 385 U.S. 492 (1967), the Supreme Court adopted the following

bright line rule:

> The choice given Petitioners was either to forfeit their jobs or incriminate
> themselves.  The option to lose their means of livelihood or to pay the penalty of
> self-incrimination is the antithesis of free choice to speak out or to remain silent.
> That practice, like interrogation practices we reviewed in *Miranda v. State of
> Arizona*, 384 U.S. 436, 464-465, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, is likely to
> exert such pressure upon an individual as to disable him from making a free and
> rational choice.

The Government contends that the defendant, in effect, waived his *Garrity* claims when

he signed forms entitled "Warnings and Assurances to Employee Requested to Provide

Information on a Voluntary Basis," both at the beginning of the interview and at its conclusion.

However, the events surrounding the defendant's interrogation, and the conduct of the

training staff at the FBI Academy as well as the interrogating agents, undermined the two critical

assertions contained in the supposed waiver:  First, while the warning form described the

interview as "voluntary," both the manner in which the defendant was brought to the interview;

and the nature and tone of the questioning, demonstrated that the defendant's participation was

not voluntary.  Secondly, while the form states "No disciplinary action will be taken against you

by the FBI or Department of Justice if you choose not to answer questions," the surrounding

circumstances clearly indicated that the defendant's refusal to answer questions would have a

substantial adverse impact – if not a decisive impact – upon his continued employment.

1

Indeed, it appears that the FBI acting in conjunction with supervisors at the FBI Training Academy, went to great lengths to confront the defendant with precisely the "Hobson's Choice" proscribed by the Supreme Court in *Garrity.*

Accordingly, the defendant's statements were not voluntarily obtained, and must be suppressed.

### A.  The Events Leading To The Defendant's Interrogation

The allegations of insider trading contained in the Indictment involve conduct by the defendant that occurred in January and February of 2021.  The public announcement that Merck had completed a tender offer for the stock of Pandion Therapeutics was published on February 25, 2021.

Almost nine months elapsed between those events and the questioning at the FBI Academy in Quantico, Virginia.  In the interim, the following transpired:

Shortly after the tender offer, FINRA reported to the Securities & Exchange Commission ("SEC") that suspicious trading activity had occurred during the lead up to the public announcement of the tender offer.

The attorneys at the Law Firm which represented Merck, including an attorney who had been involved in a romantic relationship with the defendant, were provided with a list of names of those who purchased shares during the period immediately prior to the public announcement of the Tender Offer.  The defendant's name and that of several alleged tipees were on the list.

After receiving the list, the defendant's former girlfriend contacted him to inquire whether he had traded in the stock of Pandion.  She reported the contents of the interview to her

superiors at the Law Firm.  She was subsequently interviewed by investigators from the

Securities and Exchange Commission ("SEC"), as well as the Federal Bureau of Investigation

("FBI").

Meanwhile, in or about August of 2021, the defendant began his employment as an FBI

agent.  He was stationed at the FBI training facility in Quantico, Virginia.

### B.  Supervisors At The FBI Training Academy Become Actively Involved In The Insider Trading Investigation

On or about October 27, 2021, agents of the FBI involved in the investigation, sought

authority to search the defendant's dormitory room at the FBI Academy.  Then on or about

November 3, 2021, the agents, again, sought authority to search the defendant's dormitory room.

The agents also sought and obtained authority to search two lockers used by the defendant, and a

storage shelf used by the defendant.  The warrants provided that the agents could seize the

defendant's cell phone, examine the contents of the phone and return the phone to its original

location.  The warrants further indicated that notice to the defendant could be delayed for a

period up to 30 days following the execution of the warrants.  A copy of the relevant portions of

the Search Warrant Application and Authorization for the search of the defendant's dormitory

room on November 3, 2021 are annexed hereto as **Exhibit A**

On or about November 4, 2021, FBI agents, clearly acting with the cooperation of the

staff at the FBI Academy at Quantico, gained surreptitious entry to these locations, and seized

the defendant's phone from his dormitory room.  They were able to extract the content of the

phone, and returned the phone to its original location without notifying the defendant of the

search.

Then, on November 17, 2021, the night before the defendant was to be subjected to interrogation by FBI agents regarding his alleged participation in an insider trading scheme, he was notified by supervisors at the training academy that he should report to his immediate supervisor's office, in uniform, prior to his first scheduled activity of the day.  He was also advised that his supervisor intended to discuss with him the results of a written exam. A copy of the Affidavit is annexed hereto as **Exhibit B.**

At approximately 6:00 a.m. on November 18, 2021, the defendant arrived at his supervisor's office.  According to the defendant, he was told by his supervisor that he must sign a document indicating that he had originally failed the "Legal Two" exam.  The defendant was "troubled" by the fact that he was made to sign this document notwithstanding that, in the interim, he had taken a make-up test, and believed that he had passed it.  When the meeting ended, rather than being released to attend firearms training, the defendant was escorted by his assistant supervisor to a nearby conference room where he was confronted with the two FBI agents involved in the insider trading investigation.

### C.  The Coercive Nature Of The Interrogation

The agents did not provide the defendant with his *Miranda* warnings.

Instead, he was provided with a copy of the *Garrity* warning form entitled "Warnings And Assurances To Employee Requested to Provide Information On a Voluntary Basis." A copy of the form is annexed hereto as **Exhibit C**.

The defendant was ordered to sign the form.  He was not provided with an opportunity to read the form and determine whether or not he was prepared to submit to a voluntary interview;

whether he would refuse to do so; or, whether he could obtain the advice of counsel before participating in the interview.

Far from questioning the defendant in a non-coercive manner, the lead agent told the defendant that there was substantial evidence that he was involved in insider trading; and, that he and other close family members were likely to "go to jail" as a result of the investigation. As the defendant states in his Affidavit, these statements by the lead agent, coupled with the defendant's earlier encounter with his supervisor, led him to believe that unless he not only participated in the interview, but explained to the satisfaction of the agents his involvement in the stock trading that resulted in the investigation, his refusal to participate would be reported to his supervisors and he would be terminated from employment as an FBI trainee based upon this refusal, alone, or in combination with other allegations relating to his performance as a trainee.

During the interrogation, the defendant was confronted with the content of text messages sent to, and received from, one of his alleged tipees.  He was specifically asked to explain the meaning of these text messages.  A copy of the FBI 302 memorializing the interview is annexed hereto as **Exhibit D**.

The defendant also told the agents, more than once, that he desired to have counsel present to assist him:  On the first occasion, one of the agents stood up as though to indicate that the interview was now at an end.  However, the lead agent explained to the defendant that, while he was not in a position to advise the defendant regarding whether or not it was in his interest to obtain the assistance of counsel, if he "cooperated" by answering questions, that fact, along with the information provided by the defendant, would be passed along to the United States Attorney's Office.

Thereafter, the defendant continued to answer questions.  When he, again, interrupted the interrogation to indicate, in clear terms, that he "needed an attorney," the proceedings were finally brought to a halt.

While the warning form indicates that this was to be a "voluntary interview," this assertion was belied by the following facts:

(1) The defendant, who was instructed the evening before that he would meet with his supervisor and then proceed to his next scheduled activity; was, instead, escorted by training supervisors into the interview;

(2) The defendant was immediately ordered to sign the *Garrity* warning form rather than being given an opportunity to read it and determine whether he would, voluntarily, participate in the interview;

(3) In response to the defendant's initial inquiry as to whether he should have an attorney present to assist him; the agents failed to terminate the questioning in order to provide the defendant with an opportunity to seek the advice of counsel.

(4) Moreover, events following the conclusion of the interrogation clearly demonstrated the length to which agents of law enforcement went to suggest to the defendant that unless he "cooperated" in the insider trading investigation, it would have a decisive negative impact upon his continued employment with the FBI.

While the warning form further indicates that no disciplinary action would be taken against the defendant should he choose not to answer questions, this assertion was belied by the following facts:

(1) FBI agents were clearly operating at the invitation of, and with the cooperation of the staff at the FBI Academy;

(2) The interview was taking place on the premises of the FBI Academy, between a scheduled meeting with a supervisor and scheduled firearms training;

(3) The interrogation took place while the defendant was clad in the uniform required by his work;

(4) The defendant had just been asked by his supervisor to confirm that he had earlier failed an examination administered by instructors at the Academy; notwithstanding that, in the interim, he had taken, and apparently passed, a make-up test; and

(5) The defendant was told during the interrogation that the insider trading investigation had reached a point where he was not only a "target," but on the verge of a "jail sentence."

Any reasonable person in the defendant's position would assume that his position as an FBI trainee was tenuous; that were the defendant to choose not to participate in the interview, that fact would be reported to his supervisors at the Academy; and that his refusal to participate would have a decisive impact upon his continued employment as an FBI trainee.

Upon the conclusion of the interview, the defendant was told to sign another copy of the same warning form. The time indicated on this form establishes that the defendant had spent virtually three hours subject to interrogation.  A copy of the second warning form is annexed hereto as **Exhibit E**.

### D.   The Events Following The Interview Further Serve To Demonstrate That The Defendant's Decision To Participate In The Interview Was Not Voluntarily Obtained; And, That His Refusal To Participate Would Have Been Followed By His Dismissal From Employment With The FBI

Immediately following the conclusion of the interview, the defendant was escorted to another conference room by a group consisting of his supervisor, assistant supervisor, the FBI trainer, and by both of the agents who participated in the interrogation.  There, he was required to sign documents that effectively terminated his employment with the FBI.

The defendant was handed a letter from the FBI Security Programs Manager informing him that his top secret security clearance was suspended effective upon the receipt of this letter. According to the letter, "the Security Division learned you failed to provide or fully disclose to the FBI the true nature of your relationship with a foreign national, and failed to provide, full, frank and truthful answers in connection with a personnel security determination."  The letter

was drafted on November 12, 2021, six days before the defendant was subjected to interrogation by FBI agents.  No further information was provided to the defendant regarding his alleged violation of security procedures.  A copy of the letter is annexed hereto as **Exhibit F.**

As the defendant sets forth in his Affidavit in support of the motion, at no time prior to his receipt of this letter was he informed that his security clearance was ever subject to question. At no time was he told the identity of the individual with whom he had allegedly made improper contact.  At no time was he told what the nature of the improper contact was.  And, at no time was he told the manner in which his contact violated security protocols.

The defendant was also served with a letter advising him that he was suspended indefinitely from duty and pay effective upon the receipt of this letter in light of the suspension of his security clearance.  This letter was drafted on November 16, 2021, four days prior to his interrogation by the FBI.  A copy of this letter is annexed hereto as **Exhibit G.**

The defendant also signed a dismissal form indicating that his termination from the FBI was based upon the suspension of his security clearance.  A copy of this form is annexed hereto as **Exhibit H**.

The inescapable conclusion is that the decision to terminate the defendant as an FBI agent/trainee was made well before November 18, 2021; and, that it was deliberately delayed in order to provide FBI agents with an opportunity to interrogate the defendant while he was under the impression that his failure to explain his involvement in the alleged insider trading scheme would result in the termination of his employment.

To add insult to injury, it must be noted that the *Garrity* warning form contains the following language:

Any statement you furnish may be used as evidence in any future criminal
proceedings or agency disciplinary proceeding, or both.

(Exs.C, E).

The defendant was never provided with an agency "disciplinary proceeding" regarding
his allegedly improper contact with a foreign national.  Nor, for that matter, was he afforded an
opportunity to demonstrate his lack of culpability regarding allegations of insider trading in an
agency disciplinary proceeding.

### E.  The Applicable Law

In *United States v. Stein,* 440 F.Supp.2d 315 (S.D.N.Y. 2006)(LAK), the held that an
individual claiming that a statement was compelled in violation of the Fifth Amendment must
adduce evidence both that the individual subjectively believed that he or she had no real choice
but to speak, and that a reasonable person in that position would have felt the same way. *Id.* at
328.

The defendant's Affidavit in support of the instant motion is a clear statement of his
subjective belief that his failure to participate in the interview would result in his termination as
an FBI agent/trainee.

Moreover, the facts, as described above, demonstrate that any reasonable individual
confronted with the conduct of the defendant's supervisors at the Academy and the statements
made by the lead agent during the interview, would have assumed that his/her refusal to
participate in the interview would have a substantial negative impact upon his/her employment.

In *Miranda v. Arizona,* the Supreme Court established procedural safeguards that apply in
situations where the defendant is subjected to custodial interrogation by the police. The Court
stated that these safeguards are "not themselves rights protected by the Constitution but [are]

9

instead measures to ensure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker,* 417 U.S. 433, 444 (1974).

As a result, courts have developed a heightened sensitivity to efforts by law enforcement that attempt to limit the reach of *Miranda.* For example, in determining whether a defendant is "in custody" for *Miranda* purposes, the ultimate inquiry is, not only whether there was either "a formal arrest;" but also whether there was "restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125 (1983). By the same token, the term "interrogation" includes not only express questioning of the suspect; but also, its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody), that the police should know or reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The same heightened sensitivity should apply when the circumstances surrounding an interrogation indicate to a defendant that his failure to submit to an interview with FBI agents will have a substantial adverse impact upon his ability to maintain employment. For this reason, courts in this District have found that when pressure exerted upon defendants to participate in a Government interview is the product of intentional Government action, such as by precluding a private employer from paying employee legal fees unless the employee participates in an interview; or, by announcing that the Government will consider the decision by employees as to whether to participate in interviews in determining whether to indict an employer, the *Garrity* rights of an individual employee have been violated. *See United States v. Stein,* 440 F.Supp.2d 315 (S.D.N.Y. 2006)("Stein I"); 541 F.3d at 135-36, n.2 (Stein II).

Moreover, even when *Garrity* warnings are provided at the outset of the interview, the conduct of the interview may undermine the warnings to a degree that renders the defendant's statements involuntary.

For example, in *United States v. Kaur*, 2008WL5156582 (E.D.N.Y. 2008), the District Court held that comments by an agent regarding the *Garrity* warnings to the effect that the right to remain silent applied "if a defendant committed a criminal act," were confusing and undercut the specific rights provided in *Garrity*. Moreover, by telling the defendant, who was accompanied to the interview by her union representative, that the union representative could not answer questions for her, and that she would "have to answer the questions herself," the *Garrity* right to remain silent was undermined.

The totality of the circumstances in the present case were equally, if not more, damaging to the defendant's free exercise of his *Garrity* rights. To cite one obvious consideration, it would have been clear to anyone in the defendant's position that she/he could not continue to be an FBI agent if she/he was convicted of a felony; let alone, if she/he was "sent to jail." In contrast, the offer to advise the authorities of the defendant's "cooperation," should he elect to speak, represented the only possible means by which the defendant could maintain his employment. Given the agent's comments during the interrogation, the message was clearly delivered that the only way to avoid an Indictment and a jail sentence; not to mention, the loss of employment, would be to explain the facts surrounding his trading in Pandion stock.

**F. The Relief Requested**

The burden of proof is upon the Government to establish that a defendant's statement was voluntarily obtained. *See United States v. Alleyne,* 573 F.Supp.3d 861 (E.D.N.Y. 2021). Under

the circumstances present here the Government cannot meet its burden of proof.  Accordingly, the statements must be suppressed.  In the alternative, a hearing should be held on the issue of voluntariness.

Moreover, should the Court find that the defendant's statements were involuntarily obtained, these statements cannot be used for impeachment purposes at trial; nor, can the investigative fruits of these statements be admitted.  *See Colorado v. Connelly,* 479 U.S. 157 (1986); *United States v. Dickerson,* 530 U.S. 428 (2000).  Thus, should Government seek to introduce evidence obtained following the date of the defendant's interview, the Government should be required to demonstrate that the evidence was not obtained as the "fruit of the poisonous tree."

## II.      Those Counts In The Indictment Charging The Defendant With The Substantive Crimes Of Securities Fraud And Tender Offer Fraud Are Multiplicitous

In order to be legally sufficient, an Indictment need only track the language of the statutes charged and state the approximate time and place of the alleged crime.  *See United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008).  In the present case, however, the Government resorted to a "speaking Indictment" that goes beyond what is legally required and provides significant additional detail concerning the nature of the crimes charged.  *See United States v. Wedd*, 2016WL1055737 (S.D.N.Y.).

When viewed through the lens of this Indictment, it becomes apparent that the various counts charging Seth Markin ("Markin") with Securities Fraud under Title 17 CFR § 240.10(b)-(5) (Counts Two through Nine); those counts charging the defendant with Tender Offer Fraud in violation of Title 17 CFR § 240.14(e) (Counts Seventeen through Twenty-Four); and the count charging Securities Fraud in violation of 18 U.S.C. § 1348 (Count Seventeen) are multiplicitous.

**A.  The Indictment**

The Indictment contains a 12 page introductory section consisting of 23 paragraphs which provide an overview of the insider trading scheme.

Paragraph 12 of the Indictment alleges as follows:

In February 2021, MARKIN secretly looked the Law Firm Associate's confidential work documents, without her permission, and learned that, in a matter of weeks, Merck & Co. ("Merck"), a publicly traded pharmaceutical company, was going to acquire Pandion Therapeutics ("Pandion"), a publicly traded biotechnology company, for approximately three times the value of Pandion's share price.

Paragraph 12 further alleges:

MARKIN immediately purchased Pandion stock on the basis of this material non-public information and also told several family members and friends to purchase Pandion's stock […]

The remainder of this introductory section provides a timeline of the events concerning the defendant's alleged acquisition of material non-public information, his conversations with the alleged tipee, the announcement of Merck's acquisition of Pandion, and conduct by the defendant which allegedly obstructed the investigation into suspicious trading activity in the stock of Pandion.

The Indictment clearly alleges that the insider trading scheme involved Markin's alleged misappropriation of material, non-public information concerning Merck's intent to acquire the shares of Pandion.  The Indictment also clearly alleges that Merck intended to acquire Pandion by purchasing the stock of Pandion in a tender offer.  And, the Indictment clearly alleges that the

13

defendant obtained the information by rummaging through documents provided to the defendant's girlfriend by her law firm, without her knowledge or consent.

Count One charges the defendant with conspiracy to commit Securities Fraud and Tender Offer Fraud in violation of (i) Securities Fraud 18 U.S.C. §§ 78(j)(b) and 78(f)(f) and Title 17 Code of Federal Regulations § 240.10(b)-(5); (ii) Securities Fraud 18 U.S.C. § 1348; and (iii) Tender Offer Fraud in violation of Title 15 U.S.C. §§ 78(n)(e) and 78(f)(f), and Title 17 Code of Federal Regulations §§ 240.14(e)-(3)(a) and 240.14(e)-(3)(d).

Counts Two through Nine charge the defendant with substantive acts of Securities Fraud in violation of Title 15 U.S.C. § 78(j)(b) and 78(f)(f) in accordance with Title 17 Code of Federal Regulations § 240.10(b)-(5), 240.10(b)(5)-(1) and (2).

Count Sixteen charges the defendant with Securities Fraud in that Markin and his co-defendant, knowingly executed a scheme and artifice to defraud persons in connection with the securities of an issuer; and to obtain by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities, in that Markin and his co-defendant "schemed to defraud Markin's girlfriend, the law firm associate, by embezzling material, non-public information from her for the purpose of executing securities transactions in Pandion." *See* 18 U.S.C. §§ 1348 and 2.

Counts Seventeen through Twenty-Four, charge the defendant with Tender Offer Fraud in violation of Title 15 U.S.C. §§ 78n(e) and 78(f)(f) in accordance with Title 17 Code of Federal Regulations §§ 240.14(e)-(3)(a) and (d). Each count tracks an analogous charge of Securities in Counts Two through Nine.

Finally, Count Thirty-One charges the defendant with making false statements while being interviewed by Special Agents of the FBI in violation of 18 U.S.C. § 1001(a)(2).

## B.  The Law Regarding Multiplicity

In *United States v. Bin Laden*, 91 F.Supp.2d 600 (2000), the Court defined multiplicity as follows:

> "An Indictment is multiplicitous" in the sense forbidden by the Double Jeopardy Clause, "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *Citing United States v. Walsh*, 194 F.3d 37, 46 (2d Cir. 1999), *quoting [United States v.] Chacko*, 169 F.3d at 145.

Id. 606.

## C.  The Elements Required To Prove The Substantive Counts Of Tender Offer Fraud In This Case Are Identical To Those Required To Prove The Substantive Charges Of Securities Fraud

In *United States v. Chestman,* 947 F.2d 551 (2d Cir. 1991), the Court reviewed the elements of Rule 10(b)-(5) liability under the traditional misappropriation theory; as well as those of tender offer fraud.  The Court in *Chestman* noted that the traditional theory of insider trading liability derives principally from Supreme Court's holdings in *Chiarella v. United States,* 445 U.S. 222 (1980), and *Dirks v. SEC,* 463 U.S. 646 (1983) (a securities trader commits Rule 10(b) fraud, the *Chiarella* court held, only if he "fails to disclose material information prior to the consummation of a transaction when he is under a duty to so").  The duty to disclose or abstain from trading arises from a "fiduciary or other similar relation of trust and confidence between [the parties to the transactions]."  *Chiarella,* 445 U.S. at 228.  Thus, under the misappropriation theory, a person violates Rule 10(b)-(5) when he misappropriates material non-

public information in breach of a fiduciary duty or similar relationship of trust and confidence and uses the information in a securities transaction.

In *United States v. Cassese*, 290 F.Supp.2d 443 (S.D.N.Y. 2003), the District Court made explicit what was implicit in the Court's decision in *Chestman;* namely, that in order to violate Rule 14(e)-(3), it is not required that the defendant know that his misappropriation took place in connection with a tender offer.  In *Chestman,*  the jury was instructed that it was not necessary to find either that the defendant knew that the information related to a tender offer; or that substantial steps had been taken to complete the tender offer.  *Cassese,* at 448.

The Court in *Cassese* defined the *mens rea* requirement for Tender Offer Fraud as follows:

> Thus, the Government does not have to prove the defendant's knowledge of the tender offer, but it does have to prove Cassese's belief that he committed an illegal act. Since there is no general duty to refrain from trading on material non-public information, the defendant must have believed that the information related to, or most likely related to, a tender offer in order to impose criminal liability.

*Id.* at 450.

Accordingly, in order for the Government to prove that the defendant is guilty of the charges both in Counts Two through Nine; and Seventeen through Twenty-Four of the Indictment, it will be necessary for them to establish (1) that the defendant's purchase of shares of Pandion stock and his dissemination of information involving his purchases, amount to an "act, practice or course of business which would operate as a fraud or deceit upon any person;" (2) that the defendant possessed the requisite knowledge that his conduct was unlawful; and the intent, nonetheless, to engage in the unlawful activity; and (3) that the conduct involved securities which were, in fact, the subject of a tender offer.  Should the Government satisfy these

16

three elements, it will have fulfilled the requisites for a conviction as to each of the substantive counts pled as a tender offer fraud as well as each count prohibiting securities fraud.

Accordingly, these counts are multiplicitous.

### D. The Count Charging Securities Fraud In Violation Of 18 U.S.C. § 1348 Is Likewise, Multiplicitous When Compared With The Other Substantive Counts Of Securities Fraud and Tender Offer Fraud

Count Sixteen of the Indictment alleges, in effect, that the defendant engaged in a "scheme to defraud" his girlfriend; and, was thereby enabled to engage in the unlawful sale of securities.

However, as indicated above, the allegation that the defendant defrauded his girlfriend is inherent in the contention, included in all of the substantive counts of Securities and Tender Offer Fraud, that the defendant obtained material non-public information in breach of the fiduciary duty owed by the defendant's girlfriend to the clients of her law firm. *See Chiarella*, 445 U.S. at 228. To put it another way, there would be no unlawful misappropriation of material non-public information unless (1) a fiduciary duty existed; and (2) the defendant was bound by this fiduciary duty at the time that he obtained possession of the material non-public information.

Accordingly, if the Government establishes a Securities Fraud or Tender Offer Fraud in violation of those counts referenced above, Count Sixteen of the Indictment is, likewise, established. Thus, Count Sixteen of the Indictment is multiplicitous.

### E. The Prejudice Arising From The Indictment In Its Present Form

In *United States v. Bin Laden,* and the cases cited therein, the Court established that counts in an Indictment alleging charges that are multiplicitous violate the Double Jeopardy

Clause.  The Government may argue that any harm resulting from an Indictment containing multiplicitous counts can be rectified either after the verdict or in the process of imposing sentence in order to ensure that the defendant is not punished multiple times for the same conduct.  However, we respectfully submit that a trial based upon the Indictment in its present form will violate the Due Process Clause of the Fifth Amendment in at least two respects:

First, the complexity of the Indictment may confuse jurors and prevent them from applying the elements to each of the charges upon which they will be called to deliberate. Secondly, allowing the jury to consider a "blunderbuss" Indictment such as the Indictment in this case, enhances the likelihood that the jury will, in the effort to reach a verdict, compromise by convicting a defendant on one or more counts while acquitting him of others containing the same elements.

The law is clear that a Court will not interfere with a verdict that appears, on its face, to involve "inconsistent" findings of fact.  *See Dunn v. United States*, 284 U.S. 390, 393 (1932); *United States v. Powell,* 469 U.S. 57 (1984).   Accordingly, if the case is permitted to go to the jury under the present constellation of charges, the damage will have been done; and, it will be irreversible.

### F.  The Requested Relief

We respectfully request that the Government must elect among the charges brought under (a) Counts Two through Nine of the Indictment; (b) Counts Seventeen through Twenty-Four of the Indictment; or (c) Count Sixteen of the Indictment; and dismiss the remaining counts on the basis of multiplicity.

**III.     Conclusion**

The defendant seeks to reserve all rights to bring additional motions as the continuing process of Discovery, and the further conduct of the litigation require.

For all the reasons set forth herein, we respectfully move this Court (1) to suppress the defendant's statements to FBI agents during the November 18, 2021 interview; (2) to dismiss counts of the Indictment on the basis of multiplicity; and (3) to grant such other and further relief as, to this Court, may seem just and proper.

Dated:  New York, New York
        December 29, 2022

                            Respectfully submitted,

                            SERCARZ AND RIOPELLE, LLP

                            By: /s/ Maurice H. Sercarz
                                950 Third Avenue, 31st Floor
                                New York, New York 10019
                                Telephone: (212) 586-4900
                                Email: msercarz@sercarzandriopelle.com
                                *Attorneys for Seth Markin*

19