FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    12/13/2021

SETH ROBERT MARKIN, ███████████████████████████ was interviewed on November 18, 2021 at the Federal Bureau of Investigation (FBI) Academy, 57 Bureau Parkway, Stafford, Virginia 22556 by FBI Special Agents Bempsey Co and Robert Hupcher. MARKIN is a New Agent Trainee (NAT) with the FBI, in Quantico, Virginia. After being advised of the identities of the interviewing agents and the nature of the interview, MARKIN provided the following information:

**[Administrative Note: Prior to the start of the interview and after its conclusion, MARKIN acknowledged and signed the Garrity Form (see attached) and was informed that this was a grand jury investigation out of the Southern District of NY (SDNY).]**

MARKIN learned about Pandion Therapeutics, Inc. (PAND) approximately one (1) year ago and had been following it for two (2) to three (3) months prior to having purchased their stock. MARKIN described himself as an active swing trader, often holding when the stock is down ("bag holder").

MARKIN utilized Stocktwits Internet Bots (bots), which scanned every stock, while providing news and earnings information. Stocktwits bots often recommended stocks in the form of "pop-ups" on the Stocktwits Application (app). MARKIN recalled that PAND popped up the most. The deciding factor for MARKIN to purchase PAND was when news was announced that PAND had brought in a female (UNSUB1) member of the Board of Directors, whose credentials and resume impressed MARKIN. MARKIN also recalled that PAND had just recently released their earnings and MARKIN liked their earnings report.

MARKIN also visited the PAND website and did additional research on Stocktwits. MARKIN stated that he currently had a position on a stock that is rumored to be a buy-out candidate. MARKIN did not recall any

Investigation on   11/18/2021   at   Quantico, Virginia, United States (In Person)

File #   318D-NY-3486569     Date drafted   11/19/2021

by   Bempsey G. Co, Robert Hupcher

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

conversation/twits on Stocktwits about any potential merger and/or acquisition of PAND. MARKIN felt that every stock had rumors of a potential merger or acquisition.

MARKIN invested in all different sectors, however he did like the pharmaceutical industry. MARKIN had no work experience, educational background and/or knowledge of pharmaceutical sciences, biology, chemistry, medicine, epidemiology or any other related fields within the pharmaceutical industry.

MARKIN's due diligence in selecting stocks included finding patterns in the Stocktwits' bots, researching past press releases, analyzing past earnings reports, identifying the number and/or percentages of institutional investors, and basic Google searches.

When asked by the writer who else MARKIN knew who had purchased PAND, recommended and/or were involved with the acquisition of PAND, MARKIN provided the following names:

1. PHILIP MARKIN - MARKIN's cousin whom MARKIN had told about PAND. PHILIP MARKIN purchased PAND on MARKIN's recommendation and profited approximately $3K.

2. BRANDON WONG - MARKIN's brother's (EMMET MARKIN) friend. WONG purchased PAND, however MARKIN was not aware of how much WONG purchased, nor how much WONG profited. MARKIN believed WONG had a very large nest egg. MARKIN and WONG were going to be roommates in Miami, Florida once MARKIN graduated from the FBI Academy. WONG currently lived in New York City with WONG's parents.

3. STEVEN and CARYN MARKIN - MARKIN's parents also purchased PAND, however they invested very little.

MARKIN knew of no one else who either invested in PAND, recommended PAND and/or were involved with the acquisition of PAND. MARKIN thought PFIZER had acquired PAND.

MARKIN also recommended CTXR, but did not believe anyone he knew purchased it.

When the public announcement of the acquisition of PAND occurred, MARKIN

sold all his shares of PAND. It was WONG who recommended to MARKIN to sell all of his holdings in PAND, although it might had also been a two-way conversation about selling. MARKIN and WONG had called each other after the announcement. MARKIN also researched what happened to a stock after it had been acquired and this also convinced MARKIN to sell PAND. Prior to the announcement, the stock price of PAND had been generally moving up, and MARKIN believed this was partly due to large financial institutions having purchased PAND.

**MARKIN's response about ▇▇▇▇▇▇▇ when asked by writer.**

▇▇, who lives in Washington D.C., had been romantically involved with MARKIN, however she was not his girlfriend. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ was an attorney at a "big name" law firm in Washington, D.C. who specialized in sports. MARKIN had met ▇▇ in October 2020 and not seen and/or spoken to ▇▇ since May 2021.

**MARKIN was advised that ▇▇ worked at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and had been involved with the acquisition of PAND by MERCK.**

MARKIN did recall ▇▇ had worked at ▇▇▇▇▇▇, but claimed ▇▇ rarely talked about her work. MARKIN had been aware that ▇▇ had worked on one (1) or two (2) Merger & Acquisition (M&A) deals. ▇▇ had been very stressed about her work in M&A and hated the work. ▇▇ may have mentioned to MARKIN that she had been working on a project for MERCK, however did not mention PAND. ▇▇▇▇▇▇ had code names for all the participants on the M&A, and MARKIN did not know the code name for PAND.

MARKIN and ▇▇ had been working from home, throughout the onset of the COVID-19 pandemic. MARKIN often went to ▇▇ apartment, however MARKIN did not hear anything about PAND and/or any details of the M&A deal. MARKIN had been at ▇▇ apartment several times when ▇▇ had been on a work call. MARKIN described ▇▇ as being very professional and really good at her job.

After MARKIN and ▇▇ romantic relationship had ended, MARKIN would

reach out to a mutual friend, SEAN PHILIP, to ask about ▮ since MARKIN had been concerned that ▮ may try to contact MARKIN. ▮ was aware that MARKIN was scheduled to attend the FBI Academy.

MARKIN reiterated that he had no idea that ▮ worked on M&As and/or the PAND deal. ▮ was very professional with her work and never spoke about her work, nor the details of the M&A deals she was working on. This current conversation was the first time MARKIN had heard that ▮ worked on the PAND acquisition. MARKIN recalled that towards the end of their relationship, ▮ had been working on another M&A deal.

MARKIN recalled a friend of ▮ (UNSUB2), whom MARKIN had met once at a Washington D.C. bar, who was very wealthy and according to ▮, often traded on Material Non-Public Information (MNPI). MARKIN described UNSUB2 as a tall, white male with blonde hair, who MARKIN believed was American.

MARKIN also mentioned a friend, CONNOR HAFT (Washington D.C.), whose ex-girlfriend, SAMYUKTHA WARIAR, worked for Deloitte and often mishandled classified information.

MARKIN stated that ▮ may claim she had told MARKIN about PAND, or may have blurted it out ▮ MARKIN insisted he never pushed her for information about her work, since he also dealt with classified information and was well aware of the rules.

MARKIN did not know if ▮ traded in PAND, or if ▮ even traded stocks. MARKIN never mentioned to ▮ what companies MARKIN traded in. After the public announcement of the acquisition of PAND, MARKIN believed that ▮ knew he traded in PAND. MARKIN did not recall why he believed that.

MARKIN believed ▮ was in debt and lived well beyond her means, however he did not think ▮ had told anyone about the PAND deal.

MARKIN would not have purchased PAND if he had known ▮ was involved in the acquisition of PAND and would not have purchased PAND if he could "go back in time now."

**MARKIN was asked about inconsistencies in his statements.**

MARKIN thought ▮ knew about his trades in PAND because she received

some report/list from ▇ with his name on it. MARKIN did not respond when asked what the report/list was for. ▇ called MARKIN and asked if he had traded in any stock that had been acquired. MARKIN responded that he "traded in a lot of stocks." ▇ did not specifically ask MARKIN about trading in PAND.

MARKIN was asked again if he had told anyone else about PAND, and MARKIN responded that he commented about PAND on Stocktwits.

MARKIN stated that he went "all-in" with PAND, because he did that with all the stocks he traded. MARKIN was confronted with the fact that he had never gone "all in" before PAND, to which MARKIN had no response.

▇ met PHILIP MARKIN when PHILIP MARKIN and WONG travelled to visit SETH MARKIN, and ▇ had invited herself.

**MARKIN was shown/told the following:**

**Chat messages between MARKIN and WONG on the Signal App (see attached):**

**MARKIN:** "News hasn't even dropped yet. Just keep holding"

**MARKIN:** "ok. it's not bad. But the news that was supposed to come out this week may come out next week"

**MARKIN:** "But seeing as how nobody (except the insiders) but us knows the news is coming it shouldn't effect the price"

**WONG:** "Lol we need to have 100% certainty for that, I'm scared to do another all-in in my life"

**MARKIN:** "I was just reading over emails for her on the eisai case"

**Asked for explanations as to why conversations regarding MNPI were taken off-line:**

**MARKIN:** "I invested over $20k in a stock last week."

**WONG:** "What did you buy?"

**MARKIN:** "Yeah. O. Can I call?"

**WONG:** "Call?"

**WONG:** "You mean chat on the phone?"

**MARKIN:** "Yes"

Numerous times MARKIN/WONG utilized the "disappearing message timer" on Signal, when discussing "sensitive matters"

<u>Asked about inconsistencies in his statements.</u>

MARKIN often did not have a response, looked down at the table or repeated the phrases "I know this looks bad," "I know this looks real bad" and "I know this doesn't look good."

MARKIN asked if he "should quit right now" and stated "I should quit." SA HUPCHER and the writer reminded MARKIN that the interview had nothing to do with his employment and/or training at the FBI Academy, and that this is regarding a grand jury criminal investigation.

When MARKIN asked about having an attorney, SA HUPCHER and writer informed MARKIN of the FBI's policies on attorney representation during interviews and/or an investigation.

<u>**MARKIN was given several minutes to think over his previous responses and provided the following:**</u>

MARKIN met ▮ in October 2020. At the time, MARKIN spent a lot of time at ▮ apartment. MARKIN had not told his parents about ▮ because he did not think the relationship was serious and did not want the relationship to be serious. When MARKIN met ▮, she told him she did sports law. Some time during their relationship, ▮ wanted to be the General Counsel for the Washington Football Team.

A few months after MARKIN and ▮ started dating, ▮ was brought in to working on an M&A deal at ▮. MARKIN reiterated that ▮ had used code words when discussing the M&A transaction with ▮ and that MARKIN did not know the code word for the PAND/MERCK acquisition.

▮ had tried several times, ▮ to tell MARKIN details of the

M&A deal she had been working on, specifically the name of the companies involved. MARKIN stated that each time, he told her not to tell him. MARKIN recalled one time, he and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were both in an elevator, and ▮▮ told MARKIN "he needed to get into the company and make a ton of money." MARKIN repeatedly told ▮▮ not to say anything, resulting in ▮▮ not having divulged any details.

At parties, ▮▮ would often mention the details of the M&A deal she'd been working on to their social group of friends.

At the conclusion of the interview, MARKIN provided the passcode to his iPhone and iPad ▮▮▮▮▮▮▮▮▮▮.

**MARKIN was asked about several names associated with him (see attached chart) and MARKIN provided the following:**

MARKIN had not told his brother, EMMET MARKIN about PAND, nor was MARKIN aware if EMMET traded on PAND. MARKIN had told WILLIAM LEVINE about PAND and had been aware that LEVINE purchased PAND.

When the interviewing agents pressed MARKIN about the source of the PAND/MERCK acquisition tip that MARKIN received, MARKIN refused to answer and instead requested to consult with a lawyer. The interview ended at this point in time and MARKIN was not further questioned.

The writer provided MARKIN with five (5) search warrants that were issued, but not necessarily executed, for MARKIN. MARKIN repeatedly claimed that his personal phone was in his dorm, and not on his person, on the day the first search warrant was executed.

After the interview and during an administrative matter, MARKIN stated that "all this happened after the polygraph."