UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,                                    Indictment No.: 22 CR 395 (ER)


     v.


SETH MARKIN,

            Defendant.

-------------------------------------------------------------X



**MEMORANDUM IN AID OF SENTENCING**
**ON BEHALF OF SETH MARKIN**









                SERCARZ & RIOPELLE, LLP
                950 Third Avenue, 31st Floor
                New York, New York 10022
                Telephone: 1-212-586-4900
                *Attorneys for Seth Markin*

## <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     HISTORY AND CHARACTERISTICS OF THE DEFENDANT ................................ 2

III.    THE DEFENDANT'S CONDUCT ............................................................... 5

    A.  The Defendant's Conduct Was "Opportunistic" Rather Than The Product Of An
        "Organized Scheme To Engage" In Insider Trading ....................................... 5

    B.  The Prelude To The Defendant's Receipt Of Material Non-Public Information ........... 6

    C.  The Defendant's Plea Allocution ........................................................ 7

    D.  The Defendant's Trading Activity ....................................................... 9

    E.  The Basis For The Defendant's Knowledge Regarding Pandion ........................ 9

    F.  The Defendant's Conduct In Supplying Information To Others ....................... 11

    G.  The Defendant's Conscious Avoidance .................................................. 13

IV.     FACTORS TO BE CONSIDERED IN IMPOSING SENTENCE ............................. 16

    A.  The Need For The Sentence Imposed To Afford General Deterrence ................... 17

    B.  The Need For The Sentence Imposed To Afford Specific Deterrence .................. 18

    C.  The Need For The Sentence Imposed To Provide Just Punishment For The Offense .. 18

    D.  The Need To Protect The Public From Further Crimes Of The Defendant ............. 21

V.      CONCLUSION ............................................................................... 22

## TABLE OF AUTHORITIES

Cases

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) .............................................................. 8

Statutes

18 U.S.C. § 3553 (a) ...................................................................................................................... 1
18 U.S.C. § 3553 (a)(1) ................................................................................................................ 16
18 U.S.C. § 3553 (a)(2) ................................................................................................................ 16
U.S.S.G. § 2B1.4(a) ....................................................................................................................... 5
U.S.S.G. § 2B1.4(b)(1) .................................................................................................................. 5
U.S.S.G. § 2B1.4(b)(2) .................................................................................................................. 5
U.S.S.G. § 6A1.3(a) ..................................................................................................................... 15

Other Authorities

https://www.justice.gov/usao-sdny/pr/former-fbi-agent-trainee-pleads-guilty-insider-trading-
scheme................................................................................................................................... 17

## I.   PRELIMINARY STATEMENT

At the sentencing of the co-defendant, Brandon Wong ("Wong," "Brandon"), the

Government offered the following formulaic view of the sentencing hierarchy that should be

applied in this case:

> [...] I think it's important to keep in mind Mr. Markin, who has not yet been
> sentenced.  He was the primary misappropriator.  He sits at the top of the tipper
> pyramid, and I think that the abuse of trust that comes with his particular position
> is something to keep in mind in sentencing Mr. Wong.

(Sentencing Transcript of Brandon Wong 1/26/2024 at p. 6).

With all due respect to the Assistant United States Attorneys charged with prosecuting

this case, the argument that the Court should resort to a "tipper pyramid" in determining the

sentences to be meted out to the various defendants is an invitation to ignore entirely the history

and characteristics of Seth Markin. ("Mr. Markin," "Markin," "Seth," "the Defendant").  It is an

invitation to ignore salient facts that help explain his involvement in the offense of conviction.

And, it is an invitation to avoid a careful evaluation of the factors the Court must consider in

accordance with 18 U.S.C. § 3553(a) when imposing sentence upon this unique individual.

In this Sentencing Memorandum, we will explore Seth's background based upon

information contained in the Presentence Report ("PSR") and the many letters to the Court on

behalf of the defendant.  Then, we will discuss the circumstances surrounding Seth's

involvement in the offense with reference to the "speaking portions" of the Indictment, and to

materials obtained during the Discovery process.  Finally, we will address the factors set forth in

18 U.S.C. § 3553(a), and the requirement that "the Court shall impose a sentence sufficient, but

not greater than necessary, to comply with the purposes set forth in ¶ (2) of this subsection." *See*

18 U.S.C. § 3553 (a).

## II.     HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Seth Markin has spent the bulk of his young life preparing himself for a career in public service.  As is set forth in the Presentence Report, Seth attended Muhlenberg College in Allentown, Pennsylvania, where he obtained a Bachelor's Degree in Liberal Arts, with a major concentration in Philosophy of Political Thought.  Following his graduation from college, Seth attended a Fellowship Program with the Israel Antitrust Authority ("IAA") in Jerusalem.  While there, Seth made it a point to meet both with Jewish citizens of Israel and with Palestinians in the West Bank in order to learn about the complex political realities in that corner of the world. (PSR ¶ 76, 77; Ex. B).

Upon his return, Seth continued his studies at the Elliot School of International Affairs at George Washington University where he obtained his Master's Degree in International Affairs specializing in Middle East security, in 2018.  (PSR ¶ 77).  Seth then attended hazardous materials training and became certified as a Compliance Specialist.  (PSR ¶ 78).

From March 2020 until August 2021, Seth was employed with the Department of Defense as a full-time consultant in Washington, D.C. (PSR ¶ 83).  He resigned from this employment upon receiving word that he had been accepted as an FBI agent/trainee.

The many letters submitted on behalf of this defendant present a clear and consistent picture of his character.  Seth's father, Steven Markin, has this to say about his son:

> I don't know the Seth Markin described in the Indictment.  The Seth I know is kind and compassionate, always there for his friends and family, was committed to serve his country at significant personal expense and never interacted with any criminal authority until this matter.

(A copy of Steve Markin's letter is annexed hereto as **Exhibit A**).

2

The Defendant's mother, Caryn Markin ("Caryn"), describes his academic career as follows:

> Seth's academic career was marked by his keen intelligence, hard work, and a desire to devote himself to the cause of helping others.

(A copy of this letter is annexed here to as **Exhibit B**)

Caryn notes that "upon graduation from college, Seth's goal was to embark on a career of public service."  She adds:

> If there is any question about the fact that Seth placed the desire to help others above the goal of obtaining individual wealth, the Court should note that Seth took a substantial pay cut in order to obtain his position as an FBI trainee.

(*Id.*).

Caryn explains that Seth's interest in the stock market was, itself, a product of their relationship.  In her words:

> Our joint interest in the stock market became a bonding experience for us.  We spoke frequently about matters such as the need to diversify stock picks, when to reinvest dividends, and when one can take an early withdrawal from a retirement fund without penalty.  Over the next few years, Seth actively researched stocks and not only examined my portfolio but recommended stock picks to me.

(*Id.*).

Caryn concludes that since Seth's arrest he has lived at home with his mother and father and, despite the uncertainty and anxiety in his own life, he has been bedrock for his family:

> While Seth is understandably depressed and anxious regarding his situation, he has spent the past two years trying to be strong for the rest of us.  Seth has cooked meals and baked bread for the family, helped to find TV shows to entertain his parents, helped to build or repair items around the house, and played with his nieces and nephews in an attempt to keep things as "normal" as possible.

(*Id.*).

3

Seth's girlfriend, Jamilya Kasymalieva, (referred to in the PSR as "Milla Kos") describes

Seth as follows:

> Seth is undeniably the most helpful person I ever met.  The depth of my love and
> care for him is unparalleled, and I am wholeheartedly committed to standing by
> him and defending his good character, no matter the circumstances.

(A copy of this letter is annexed hereto as **Exhibit C**).

As an example, Milla points to Seth's efforts in helping her to prepare to become an

American citizen:

> As an immigrant from Kyrgyzstan, I obtained my citizenship in 2022, and Seth
> played a crucial role in helping me prepare for this milestone, teaching me about
> American history, driving me to the interview, waiting for me outside while
> worrying more than I think I did, because he knew how long I've waited for this
> to happen and how important it was for me.  […]

(*Id.*).

Milla describes the strength of character that Seth displayed in talking to her about his

legal problems:

> Throughout the legal proceedings, Seth maintained a level of truthfulness and
> honesty with me that I deeply appreciate.  He never hid or lied about the situation,
> demonstrating integrity even during challenging times.  This transparency has
> strengthened our bond and I am grateful for his forthrightness.

(*Id.*).

Milla comments, as have many of those who wrote character references, on Seth's efforts

to overcome his feelings of despair and anxiety by helping others:

> Seth's resilience is truly remarkable as he has consistently reassured those close to
> him ensuring that they do not worry excessively about his wellbeing.  However, I
> have observed that beneath his outward composure lies a genuine and intense
> emotional struggle.  […]
>
> I believe Seth's ability to maintain a positive and strong façade, even in the face
> of adversity, speaks volumes about his character.  His concern for the wellbeing
> of those around him, despite the personal challenges he faces, further emphasizes
> the depth of compassion and selflessness.

(*Id.*).

Alessandra Griffitt, who was employed together with Seth at OneWeb, found that Seth

was there for her when her husband passed away suddenly in 2021.  She writes:

> But beyond his professional aptitudes and impressive accomplishments, there's a
> friend and guardian angel.  Simply put, Seth saved my life.
>
> He was there for me during difficult times, specially when my husband passed
> away in 2021.
>
> He has been a source of strength, teaching me Yoga, breathing exercises, how to
> navigate my emotions, and handle my anxieties, so I can be the best mother for
> my children.
>
> He has thought so much about emotional intelligence and how to endure stress.
>
> Everything he does and says is inspiring to my children.
>
> I cannot bear the thought of not seeing or talking to Seth. My children and I
> would suffer without his positive influence.

(A copy of Alessandra Griffitt's letter is annexed hereto as **Exhibit D**).

The consistency of the various letters, annexed as Exhibits A - G,  demonstrates that

Seth's participation in the offense of conviction was aberrational and a departure from an

otherwise law abiding life.

### III.     THE DEFENDANT'S CONDUCT

**A.  The Defendant's Conduct Was "Opportunistic" Rather Than The Product Of An
"Organized Scheme To Engage" In Insider Trading**

United States Sentencing Guidelines § 2B1.4 deals with Insider Trading.  The calculation

of the Defendant's Offense Conduct is driven by three factors; a base Offense Level (*see*

U.S.S.G. § 2B1.4(a)); the "gain" resulting from the offense (*see* U.S.S.G. § 2B1.4(b)(1)); and, an

enhancement to be applied in cases involving an organized scheme to engage in Insider Trading

(*see* U.S.S.G. § 2B1.4(b)(2)).  The Application Notes provide that "an organized scheme […]

involves considered, calculated, systematic, or repeated efforts to obtain and trade on inside information, as distinguished from fortuitous or opportunistic instances of insider trading." (*Id*.). Neither the Plea Agreement nor the Presentence Report provide for this enhancement with regard to the Defendant's conduct.

The "opportunistic" nature of the Defendant's conduct is demonstrated by the following: The Defendant initially obtained information regarding Merck's proposed acquisition of the stock of Pandion as the result of happenstance.  Thereafter, the Defendant obtained additional information as the result both of his research into Pandion; and of conversations initiated by the Associate regarding her workload and the stress of her job.  While Brandon Wong offered the Defendant a stream of benefits should his trading in Pandion prove to be profitable, there was no "*quid pro quo*" between the Defendant and Wong, or the others to whom he provided information about the stock.  And, following the public announcement of Merck's agreement to purchase the stock of Pandion, the Defendant made no further efforts to engage in insider trading based upon information obtained from the Associate.

## B.  The Prelude To The Defendant's Receipt Of Material Non-Public Information

Seth Markin became romantically involved with the Associate in the fall of 2020.  At the time, she was employed at the firm of Covington & Burling, assigned to the section of the D.C. Office that dealt with "sports law."   The Associate worked in the offices of Covington & Burling where she maintained her files and other work-related documents.

However, as the Indictment notes, as of January and February 2021, almost all employees of the law firm were working from home because of COVID-19 pandemic restrictions.  By then, the Defendant regularly worked from, and spent significant time at, her apartment "sometimes

for multiple days, and sometimes when she was not present."  (Indictment at ¶ 7).  As an

inevitable result, the Defendant was exposed to Associate's work documents.  In the words of the

Indictment:

> Since the Law Firm Associate was working from home, she had to and did take
> confidential work calls from her apartment, sometimes on speaker phone, and also
> kept work documents such as binders, notes, and legal pads out in the open in her
> apartment.

(Indictment at ¶ 8).

In late January 2021, the Associate was assigned to perform work for Covington &

Burling clients involved in mergers and acquisitions.  Her first such project began on January 31,

2021, when the Associate joined the team of attorneys working on the Pandion acquisition.

(Indictment at ¶ 9).

## C.  The Defendant's Plea Allocution

Mr. Markin stated that on or about January 31, 2021, the Associate received a print job

from the firm and requested that he help her take the material out of the boxes and organize it on

her shelves.  Mr. Markin admitted that one of the binders was open to a document; that he read

the document and noticed that it related to the proposed acquisition by the Associate's client,

Merck & Co. ("Merck"), of the stock in Pandion Therapeutics ("Pandion"), with the ticker

symbol PAND.

Armed with this information, Markin researched Pandion and learned that it had recently

conducted a successful clinical trial of a new drug to treat the symptoms of Lupus; and, that

Pandion was attracting stock purchases by hedge funds and individuals that he regarded as

"insiders."  As a result, the Defendant began purchasing shares of Pandion stock.

The Defendant further stated that over the course of the next four weeks, the Associate periodically engaged him in conversation about her workload, the stress caused by her unfamiliar assignment and the last minute deadlines, which, when taken together with the information the Defendant had already obtained, led him to believe that the acquisition proposal by Merck was accepted; and, that the public announcement of the merger would soon take place.

The Defendant acknowledged that throughout this period he continued to invest in the stock of Pandion, and advised others, including family members, to invest as well.

With regard to the Defendant's knowledge and intent, he admitted that his conduct was the product of willful blindness in that he deliberately avoided telling those to whom he touted Pandion stock about the sources of his knowledge; and, avoided responding to those who asked him whether his recommendation of the stock was based upon "insider information."

The Government acknowledged that the Plea Allocution satisfied the elements of Count Two of the Indictment.[1]  The Government offered no objection to the truthfulness and accuracy of the Defendant's statement:

| | |
|---|---|
| THE COURT: | Ms. Tekeei, should I ask any additional questions? |
| MS. TEKEEI: | No. Thank you, Your Honor. |
| | […] |
| THE COURT: | Ms. Tekeei, is there reason why Mr. Markin should not be permitted to plead guilty? |

---

[1] In determining whether the Defendant should enter a plea of guilty to a single count of Securities Fraud, we were mindful that all of the Defendant's trading activity was also charged in the Indictment in counts relating to Tender Offer fraud; and, that these counts do not require, as an element, that the Defendant misappropriated the information from an individual or entity with whom the Defendant had "a relationship of trust and confidence."  *See United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991).

      MS. TEKEEI:        No, Your Honor.

(Plea Transcript of Seth Markin 12/24/2023 at pp. 22-23).

**D.  The Defendant's Trading Activity**

The Indictment alleged that the Defendant engaged in trading activity in the stock of Pandion beginning on February 1, 2021 and made further purchases on February 2, February 3, February 4 and February 5, 2021.  (Indictment at ¶ 29(c)).  All of these purchases occurred prior to the offer by Merck to purchase the stock of Pandion, on February 7, 2021.  (Indictment at ¶ 10). The Defendant continued to purchase Pandion stock until two days prior to the public announcement of the merger. (*Id*. at ¶ 29(c)).

**E.  The Basis For The Defendant's Knowledge Regarding Pandion**

While the Indictment suggests that the only source for the Defendant's information was that he "secretly looked through the Associate's work documents without her permission" (Indictment ¶ 1), the Discovery Material provides support for the Defendant's contention that much of what he learned about Pandion came to him as the result of the Associate's propensity to talk to him about her work.

According to the Defendant, in his earliest conversations with the Associate after she was assigned to the Merck-Pandion Tender Offer, she described the deal as an offer by her firm's client to purchase the stock of Pandion for up to three times the current share price.  The Defendant's subsequent research revealed that the current sale price for Pandion stock at the end of January and during early February was in the range of $20 a share.

The Government provided defense counsel with FBI 302 reports regarding two interviews with the law firm Associate.  The first took place on November 18, 2021, the same

9

day that the Defendant was interviewed at the FBI Academy.  The second interview took place

on December 17, 2021.  During the second interview, the Associate acknowledged that she

periodically complained to the Defendant about having "a lot of work to do or about last minute

deadlines."  (A copy of the Associate's FBI 302 dated 12/17/2021 is annexed hereto as **Exhibit**

**H**; p. 4).  She conveyed her frustrations about working on PAND with Markin because there was

often a lot of last minute work.  (*Id.* at p. 7). She acknowledged that in those conversations, she

referred to the deal as either "Panama" (the code name used for this transaction at Covington &

Burling) or "PAND" (the ticker symbol).  (*Id.* at p. 5).  While she claimed that she could not

remember an instance in which she conveyed material non-public information to the Defendant,

her propensity to impart detailed information about the deal is demonstrated by her complaints

regarding the management structure of the "Panama deal," and the management style of one of

her superiors. (*Id.* at p. 17).

       The Associate admitted, however, that when she complained to Markin about PAND, he

did not ask follow up questions.  (*Id.* at p. 7). And, the Associate "did not remember telling

Markin that he could not invest in  PAND and assumed that he would not trade in PAND." The

Associate trusted Seth Markin "because they were in love." (*Id.* at 6).

       During the same interview, the Associate described her telephone call to the Defendant

after she was repeatedly contacted by FINRA with a list of those engaged in suspicious trading in

the lead up to Merck's Tender Offer – a list that included the name Seth Markin and the names

of Markin family members.  She acknowledged that she waited until the third written inquiry

from FINRA prior to calling the Defendant.  She admitted that it was clear to her that the person

described in the letters from FINRA was, indeed, the person with whom she had been

romantically involved.  Yet, following her brief conversation with the Defendant, she responded

to FINRA by denying that the Defendant was the person referenced in their inquiry. (*Id.* at pp. 8-9).

Thus, while the Defendant was less than truthful in his conversation with the Associate, her behavior both before her phone conversation with the Defendant and thereafter, suggest that she recognized a measure of responsibility for the fact that the Defendant was in possession of material non-public information.

## F.  The Defendant's Conduct In Supplying Information To Others

At the sentencing of the co-defendant, Brandon Wong, the Government noted that Wong had engaged in two proffer sessions with the Government; that the Government had supplied defense counsel with 3500 Material regarding those sessions; and, that soon thereafter, the Defendant agreed to enter a guilty plea.  The Government vouched for Wong's statements as "truthful." (Sentencing Transcript of Brandon Wong 1/26/2024 at p. 8).

Here again, while the Indictment suggests that the Defendant obtained material non-public information regarding Pandion solely by rummaging through the Associate's confidential materials, the discovery offers evidence of a more nuanced explanation.

Agents of the FBI first interviewed Wong on November 18, 2021, the same day that both the Defendant and the Associate were interviewed.  (A copy of the FBI 302 of Brandon Wong's proffer session dated 11/18/2021 is annexed hereto as **Exhibit I**).  Wong first offered a false account of having learned about Pandion stock by performing Internet research.  Then, immediately after having been advised that lying to the FBI was a felony, Wong changed his tune and began to claim, *inter alia*, that Markin had provided him with information regarding Pandion stock after having reviewed the binder "multiple times." (*Id.* at p. 3). However, during

11

the very same interview, Wong stated that Seth Markin was never alone in the Associate's apartment. (*Id.* at 6). Wong then "speculated" that Markin looked at the binder when the Associate was in the shower or not in the room. (*Ibid*.).

In his first text message to Brandon Wong on the subject of Pandion on February 8, 2021 – a week after the Defendant was exposed to the material in the Associate's binder, and after Merck made its offer to acquire the stock of Pandion – the Defendant revealed the following details regarding his investment:

> I invested over 20k in a stock last week.
>
> Idk how it's going to go, but I'm hoping to making money bc that's a lot of money to me.
>
> I just did the math, actually I invested 27k
>
> Every portfolio I went IN
>
> Hopefully that 27k turns into 60k.

(A copy of the text message is annexed hereto as **Exhibit J**).

The Defendant's description of his hoped for gain demonstrates a lack of knowledge regarding the precise details of Merck's initial offer, a week <u>after</u> Markin had begun purchasing stock in Pandion.

The subsequent messages exchanged between the Defendant and Wong throughout the period of their trading activity do not contain any additional detail regarding the proposed price or other provisions of the Tender Offer. This would indicate that – apart from the Defendant's perusal of the work document in the binder on January 31, 2021 – the Defendant had <u>not</u> viewed additional documents relating to the planned merger.

With regard to those other individuals who were tipped by the Defendant, the following should be noted:  They were people with whom he was already in the habit of discussing stocks.

12

Indeed, one of the tippees referred to these conversations as "a boys group chat" when interviewed by the Government. The Defendant did not apprise those whom he tipped of either the contents of the Associate's work document or of the additional information learned in his conversations with the Associate.  Instead, he described the attributes of Pandion that he discovered in his research and expressed a great deal of confidence that the price of the stock would go up.  Wong, and several of the others the Defendant tipped were, nonetheless, under the impression that he was in possession of insider information based on the tone and content of his statements.  Yet, the Defendant refused to answer their inquiries regarding whether he based his recommendation upon material non-public information.

## G.  The Defendant's Conscious Avoidance

While the text messages between the Defendant and Wong include instances where Wong suggested that, if asked, he would claim that he learned about the stock from research on the Internet, contrary to the assertion in the Indictment, the Defendant and Wong did not employ a joint cover story to conceal the basis for their trading activity.  (Indictment at ¶ 21).  When Wong was first interviewed by agents of law enforcement, he told the agents that he first heard about Pandion by reading about a successful clinical trial of one of Pandion's pharmaceuticals in a forum on Reddit. (Ex. I at p. 2).  Wong added that it was he who tipped Markin regarding the stock.  (*Id.*).  And, Wong claimed that he followed the stock on Stocktwits where Pandion was generating a lot of "buzz."  (*Id.*).  In contrast, when Markin was interviewed by FBI agents on November 18, 2021, he made no mention of the Reddit forum and admitted that it was he who tipped Brandon regarding the stock. (A copy of the FBI 302 Interview of Markin is annexed hereto as **Exhibit K**).

13

Moreover, the Indictment fails accurately to quote perhaps the most significant text message between the Defendant and Wong.  The relevant portion of Paragraph 16 of the Indictment reads as follows:

> By in or about February 15, 2021, SETH MARKIN, the Defendant, learned about Merck's decision to delay closing the acquisition of Pandion.  MARKIN told BRANDON WONG, the Defendant, that "the news that was supposed to come out early this week may come out next week."  MARKIN, however, assured WONG that "seeing how nobody (except the insiders) […] knows the news is coming it shouldn't effect [sic] the price."

In fact, the full content of the relevant portion of the text message is as follows:

SETH:       Bad news on [Panda emoji]

BRANDON:  What?

            Nooooooo

            Don't say that

SETH:       Ok it's not bad. But the news that was supposed to come out this week may come out next week.

BRANDON:  LOL oh, ok.

            That's fine

            As long as it's not gonna drop or something.

SETH:       <u>But seeing as how nobody [except the insiders] but us knows the news is coming it shouldn't affect the price.</u> (Emphasis supplied).

(A copy of the page containing the relevant text message is annexed hereto **Exhibit L**).

The unusual syntax – particularly in a text message – indicates that Seth viewed Wong and himself as falling into a category other than  those he commonly referred to as "insiders." However, the message offers a clear indication that Markin was struggling with the fact that he was imparting to Wong material non-public information.

14

In comparing the Defendant with others on the Government's "tipper pyramid," it must be noted that, while Brandon Wong and others were presented with advice concerning Pandion based upon what several of them immediately regarded as insider (material non-public) information, Markin first became aware of Pandion through inadvertence; and, by the time Seth tipped others, he had already engaged in significant research into Pandion.  The evidence further suggests that Seth deluded himself into believing that so long as he did not further examine the Associate's documents; did not actively seek information from the Associate regarding the merger negotiations; and, did not tell those that he was tipping about the source of his information, he would  not run afoul of the law.

U.S.S.G. § 6A1.3(a) provides:

> In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the Rules of Evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

In this regard, we readily acknowledge that the information obtained from the Associate, both as the result of the Defendant's perusal of her binder, and as the result of information she imparted in those conversations in which she expressed frustration with the duration of the Pandion project, the last minute timing of her work assignments, and the fact that the project continued beyond its originally estimated closing date, all amounted to material non-public information.  We contend, however, that there is evidence to demonstrate that the Defendant did not actively seek much of the information that he obtained.

While we are not requesting a *Fatico* hearing, in the event that the Court requires additional fact finding, we are prepared to call the law firm Associate and to examine her

regarding the extent to which she may have – however inadvertently – disclosed such information to the Defendant in conversation.

While Wong asserted – after receiving his warning that lying to agents during the interview was a felony; and, again, during proffer sessions – that Mr. Markin reviewed the Associate's binder on "multiple occasions," and that he knew he was trading on "insider information," we submit that there is evidence to demonstrate that Wong had a strong incentive to tell the agents who interrogated him, and the Government during the subsequent proffer sessions, what he thought they wanted to hear.  Wong had substantial concerns that if the investigation into his behavior broadened, it might encompass additional criminal activity.  In support of our contention, we are supplying under seal, a report prepared by an investigative firm employed by the defense, regarding activities by Mr. Wong. (A copy of the Investigative Report is annexed hereto as **Exhibit M**).

## IV.     FACTORS TO BE CONSIDERED IN IMPOSING SENTENCE

18 U.S.C. § 3553 (a)(1) states "the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in ¶ (2) of this subsection."  18 U.S.C. § 3553 (a)(2) reads as follows:

The need for the sentence imposed –

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In the following paragraphs, we will treat the factors outlined in subsection 2 as they apply to Seth Markin.

## A.  The Need For The Sentence Imposed To Afford General Deterrence

When the Defendant engaged in the conduct described in the Indictment, he had not, as yet, commenced his duties as an FBI agent/trainee.  By the time he was arrested and charged with these crimes, he was no longer an FBI agent/trainee.  Yet, on the date of his guilty plea, the U.S. Attorney's Office for the Southern District of New York issued a Press Release under the headline "Former FBI Agent Trainee Pleads Guilty To Insider Trading Scheme."

Beneath the headline, the press release includes the following text:

> U.S. Attorney Damian Williams said: "Seth Markin, who had been accepted into the Federal Bureau of Investigation as a new agent trainee, chose to act as if the law did not apply to him when he misappropriated confidential information, traded based on that information, and tipped several friends and family members, resulting in millions of dollars of illegally obtained trading profits.  Markin knew his actions were wrong, deleted evidence of his crimes, and lied to try to cover up his scheme. No one is above the law, and this Office's commitment to protecting the integrity of the financial markets remains a priority."

*See* https://www.justice.gov/usao-sdny/pr/former-fbi-agent-trainee-pleads-guilty-insider-trading-scheme

The purpose to be accomplished by publicizing Mr. Markin's Indictment, guilty plea and sentence was, clearly, to demonstrate, in the words of the Press Release, that "no one is above the law."  However, by publicizing Mr. Markin's work as an FBI agent/trainee, the Government has, at the very least, imposed upon the Bureau of Prisons the need to employ extra safeguards to ensure that Mr. Markin is safe throughout the period of his incarceration.  It may be that he will need to be segregated from other inmates and/or be subject to additional restrictions throughout his term of incarceration.  Because any term of imprisonment may be, qualitatively, more

onerous on this defendant due to his well-publicized ties to law enforcement, we submit that it can be less lengthy in order to achieve the goal of general deterrence.

**B.  The Need For The Sentence Imposed To Afford Specific Deterrence**

The Defendant's arrest, Indictment and separation from his chosen career, have chastened Mr. Markin.  A brief anecdote regarding his behavior while on supervised release will make the point:

Paragraph 71 of the PSR indicates that Mr. Markin did not use controlled substances or engage in significant alcohol consumption.  Yet, since his removal from the FBI and subsequent arrest, he has found it necessary to take THC gummies that he lawfully obtained in order to assist him with his appetite and sleep.  The Defendant readily acknowledged his usage of the gummies in his interview with the Probation Department.  When he was told to desist from using the gummies, he immediately did so.  The Defendant reported that his last use of THC gummies occurred on December 11, 2023.  The evidence indicates that his blood system is free of cannabis.

**C.  The Need For The Sentence Imposed To Provide Just Punishment For The Offense**

During Markin's interview with FBI agents on November 17, 2021, he was confronted with his failure to give full and complete responses to questions involving his knowledge regarding the Merck Tender Offer for Pandion stock.  Markin immediately asked the agents whether he "should quit right now," and, then stated, "I should quit."  (Ex. K).  The agents reminded Markin that the interview had "nothing to do" with his employment and/or training at

18

the FBI Academy, and that it was, instead, being conducted in connection with a grand jury criminal investigation.[2]

At the time of the interview, the agents had in their possession letters from the FBI Acting Executive Director of Human Resources, prepared days earlier, which suspended the Defendant's security clearance and effectively terminated his employment as an FBI agent/trainee. The letters were based upon allegations that he had failed to fully disclose his relationship with a foreign national, even though he was questioned regarding his contact with foreign nationals using a polygraph before being accepted as an FBI agent.  (A copy of the letters are annexed hereto as **Exhibit N**).  Immediately following the interview, Markin was presented with the letters.  He was required to sign the letters in a space indicating receipt, and was immediately escorted off the premises of the FBI Academy.  It is little wonder that the Defendant viewed the allegations regarding his failure to disclose information concerning a foreign national as "pretextual," and regarded his termination as a product of the insider trading investigation.

Upon leaving the campus of the FBI Academy, Markin drove to his apartment in Falls Church, Virginia. ███████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████   The friend, Cheikh Faye writes as follows:

> He came inside and we sat on the couch. The first thing he was able to say was "Cheikh, I f****** up." ████████████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> ███████████████████████████

---

[2] The Court denied the Defendant's Motion to Suppress these statements.

(**Exhibit E**).

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

     As the many character references written on Seth's behalf attest, Seth has attempted to

combat ████████████████████████████████ by taking on the job of a Yoga Instructor

and by devoting himself to the task of helping family members and others.

     Any term of incarceration imposed upon my client will deprive him of these constructive

methods of dealing with his emotions.  In my untutored view, it will be "pure hell" for Seth to

live alone with his thoughts during his period of incarceration.

     In his letter on behalf of the Defendant, his friend, Cheikh Faye says the following:

> While it is regrettable that Seth finds himself in his current predicament, I want to
> emphasize his willingness to accept responsibility for his actions. In recent
> months, he has actively taken steps to reflect on his life and make positive
> changes. In our many phone calls it is clear to me that Seth is not only under
> substantial stress, but also remorseful of his actions. He has continued to try to
> help others, but this time through Yoga and now chooses to only affiliate himself
> with honest people of similar morals. I am confident that, if given the chance,
> Seth will continue to contribute positively to society.

(Ex. E).

**D.  The Need To Protect The Public From Further Crimes Of The Defendant**

The Guidelines calculation in this case does not distinguish the range applicable to the Defendant's conduct from the range applicable to the Brandon Wong on the basis on the wide disparity between the $80,000 gain obtained by Seth and the $1.3 million gain from Brandon Wong's investments in the stock of Pandion.  In each case, the Guidelines sentencing range is calculated with reference to the reasonably foreseeable "gain" obtained by the Defendants and the downstream tippees.  However, in determining the sufficiency of a proposed sentence to protect the public from further crimes of a defendant, the nature of that defendant's conduct, as well as the motives of that defendant, are relevant.

In his personal trading activity, Seth limited his investment to funds he had earned from prior trades, and funds he had available in savings.  And, in tipping others, Seth was motivated by factors other than greed.  Seth tipped close family members, including his parents, by describing aspects of Pandion, learned during his research, that made this a favorable investment vehicle. And, apart from Wong's spontaneous offer to purchase a Rolex watch and other luxury items for the Defendant, there was no *quid pro quo* between the defendant and Wong and no discussion between the Defendant and any of the others he tipped regarding the stock in Pandion. Rather, it was Wong who spontaneously offered a string of benefits to Markin if the trading in Pandion stock made him rich. (Indictment at ¶ 20).

In contrast, Wong's conduct demonstrates that for him, greed was at the forefront. According to the Government's Sentencing Submission  as to Brandon Wong:

> Wong told Markin that he was investing all of his money, was going to sell all of his other stocks, take out a six figure loan, borrow against his life insurance, take money from his mother, and use cash he received in red envelopes for Chinese New Year to purchase more Pandion stock.

(Gov't Sentencing Submission at pp. 4-5).

Moreover, following the public announcement of the Tender Offer, Wong sought to convince Markin to obtain from the Associate additional information so that Wong could continue to engage in insider trading.  At Wong's sentencing, the Court noted that it found his continued efforts to take advantage of Markin's relationship with the Associate "particularly troubling." (Sentencing Transcript of Brandon Wong at p. 22).

Yet, notwithstanding Wong's exhortations, Mr. Markin did not conduct further trading based on information obtained from the Associate; nor did he provide Wong, or anyone else, with such trading information.

Finally, if the adage "you can judge a person's character by how he/she responds to adversity" has resonance, it is a good bet that Seth will never be in trouble again.   Since his arrest, Seth has sought and obtained employment as a Yoga Instructor and has entered into a relationship with Ms. Kos based not upon his academic awards, or his prior status as an FBI agent; but rather, based upon his selfless nature and his integrity in dealing with the adversity in his life.

## V.   CONCLUSION

Seth's brother-in-law, Eric Spiegel, echoes the views of all who know Seth when he says:

I am confident that Seth will walk the path of growth and redemption in the next
chapter of his life, and that all who walk and on this part with him will benefit
from the person he is and the person he is in the process of becoming."

(**Exhibit F**).

22

For all the reasons set forth herein, we respectfully submit that a sentence of no more than the five month term imposed on Brandon Wong, will be "sufficient, but not greater than necessary" to meet all of the sentencing goals of 18 U.S.C. § 3553 (a).


Dated: February 28, 2024
        New York, New York


                        Respectfully submitted,

                        SERCARZ AND RIOPELLE, LLP

                        By: /s/ Maurice H. Sercarz
                             950 Third Avenue, 31st Floor
                             New York, New York 10019
                             Telephone: (212) 586-4900
                             Email: msercarz@sercarzandriopelle.com
                             *Attorneys for Seth Markin*