UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                   :

UNITED STATES OF AMERICA               :

                                   :

        - v. -                       :           22 Cr. 395 (ER)

                                   :

SETH MARKIN,                     :

               Defendant.      :

                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## THE GOVERNMENT'S SENTENCING SUBMISSION


 

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Nicolas Roos
Negar Tekeei
Assistant United States Attorneys
- Of Counsel -

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Seth Markin scheduled for March 13, 2024.

## PRELIMINARY STATEMENT

Seth Markin should be sentenced to a term of imprisonment of 30 to 37 months. He breached his duty of trust to his girlfriend, who in turn had been entrusted with confidential information by her employer, by misappropriating that information and using it to trade stock. He did this knowing that it wrong, and callously joked with one of his co-conspirators that he needed to stay in the romantic relationship so that he could do it again. When he was confronted with his conduct, first by his girlfriend who received a Financial Industry Regulatory Authority ("FINRA") inquiry, he lied, saying it was not him. Then, when the FBI approached him, he lied again, saying he received the information off an online website called StockTwits. Most recently, during his plea allocution and through his sentencing submission, the defendant obfuscated and minimized his conduct again, claiming that he was drawn to the stock because of a "successful clinical trial" and "purchases by hedge funds," "did not actively seek information" from his girlfriend, and was "willfully blind" to what he was doing. Dkt. 149 (Defendant's Sentencing Memorandum) at 7-8, 15.[1] In fact, the defendant abused a position of trust, knew exactly what he had—a potential "money party," to use his phrase, based on inside information, tipped friends and family, and then concealed what he was doing when he was caught.

A Guidelines sentence will assure that Markin is held accountable for his crime, which involves both misappropriation and breach of trust, as well as unlawful trading. It will serve the

---

[1] "Dkt. [Number]" refers to a docket entry in this case; "PSR" refers to the final Presentence Investigation Report, filed by the United States Probation Department on February 23, 2024; and "Ind." refers to Indictment 22 Cr. 395. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

most important aims of sentencing: the punitive loss of liberty as a result of the nature of the defendant's crime, which will send a powerful message of deterrence, and provide some measure of closure to the victims, most notably the girlfriend from whom he misappropriated and the law firm that had its confidential information stolen.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   Offense Conduct Overview

In early 2021, Seth Markin and Brandon Wong together made more than $1.4 million in illegal profits by trading in stock based on inside information that Markin stole from his then-girlfriend, who was at the time an attorney at a major law firm in Washington D.C. PSR ¶ 13.  In February 2021, Markin secretly looked through his girlfriend's confidential work documents, without her permission, and learned that, in a matter of weeks, Merck & Co. ("Merck"), a publicly traded pharmaceutical company, was going to acquire Pandion, a publicly traded biotechnology company, for approximately three times the value of Pandion's share price. *Id.*

Markin immediately purchased Pandion stock on the basis of this material non-public information and also told several family members and friends to purchase Pandion's stock, causing Wong, another friend, and several family members to do so. *Id.* ¶ 14. In text messages, Markin assured Wong that he was "not uncertain" that when the "news drop[ped]" about Pandion, the price would "EXPLODE" and they would earn "triple gains."  *Id.*

Wong purchased hundreds of thousands of dollars' worth of Pandion shares based on the material non-public information he received from Markin. *Id.* ¶ 15. In addition to his purchases of Pandion stock, Wong told at least seven other people to purchase Pandion shares, causing some of the people he tipped to purchase tens or hundreds of thousands of dollars' worth of Pandion stock. *Id.*

In total, Markin and Wong together caused at least twenty people to trade in Pandion stock based on the material non-public information that Markin misappropriated from his girlfriend, resulting in millions of dollars of illegally obtained trading profits. *Id.* ¶ 16.

After Merck's acquisition of Pandion was announced publicly, and the Pandion stockholdings of Markin and Wong, and those whom they tipped, significantly increased in value, the defendants sold their shares of Pandion for significant profits. *Id.* ¶ 19. With their illegal profits, the defendants and their tippees purchased luxury items and bought gifts for each other. *Id.* For example, Wong purchased for Markin a Rolex watch valued at approximately $40,000, a trip to Hawaii, and a meal at a three-Michelin-starred restaurant in New York that cost over $1,000. *Id.* Wong also purchased a home in Florida. *Id.*

Thereafter, Markin lied in order to hide his illegal insider trading. *Id.* ¶ 21. In or about June 2021, after Markin had ended his relationship with his girlfriend, and as he was preparing to begin training as a new agent at the FBI Academy in Quantico, Virginia, his then-former girlfriend called him to ask why Markin's name had come up in an inquiry by the FINRA into trading in Pandion stock. *Id.* In response, Markin lied to his ex-girlfriend and falsely claimed that he did not trade in Pandion stock. Markin subsequently took steps to further conceal his criminal activity, including by lying to the FBI when he was interviewed about the trading at issue in this case. *Id.* ¶ 22.

**B.      Illegal Trading in Pandion Shares and Tipping Friends and Family**

Between on or about February 7, 2021, which was the day Merck submitted a proposal to buy Pandion, and on or about February 9, 2021, Markin tipped Wong and encouraged him to purchase shares of Pandion. Ind. ¶ 14. On or about February 7, 2021, Markin texted Wong over an encrypted messaging application that Markin "went IN" on a certain stock in "every portfolio." *Id.*  On or about February 9, 2021, Markin and Wong spoke by phone, after which, on or about

February 10, 2021, Wong purchased Pandion shares valued at more than $100,000. Neither Markin nor Wong had ever purchased shares of Pandion prior to February 2021. *Id.* In text messages, Wong told Markin that if he made a lot of money, he would buy Markin a "nice android" and that he would take them to a "fancy restaurant." *Id.* Markin countered that he wanted a Rolex watch. *Id.*

Throughout the next several days, Wong continued to purchase shares of Pandion based on material non-public information conveyed to him by Markin. *Id.* ¶ 15. Markin encouraged Wong to buy more shares, telling him that the stock was going to "EXPLODE tomorrow or by weeks end" when the "news drops" and that they were going to get "TRIPLE GAINS!" *Id.* In order to maintain the secrecy of what they were doing, MARKIN and WONG agreed that they would refer to Pandion as "Panda," and use the "🐼" emoji in text messages. *Id.*

By in or about February 15, 2021, Markin learned about Merck's decision to delay closing the acquisition of Pandion. Markin told Wong that "the news that was supposed to come out this week may come out next week." *Id.* ¶ 16. Markin, however, assured Wong that "seeing how nobody (except the insiders) . . . knows the news is coming it shouldn't effect [sic] the price." *Id.* Wong asked, "Is there a reason they're delaying in making their announcement or whatever? Their big revelation." Two days later, Markin tipped Wong that "everything is ready for the news to drop" and that the only holdup was that one of the company's CEOs needed to sign the deal documents. *Id.* Markin added, "Literally any day now. All the work is done." *Id.* Markin and Wong were so confident in the material non-public information that Markin had misappropriated that they both repeatedly told each other over text message, "we are not uncertain" and "🐼 is not unknown." *Id.*

Because they believed that the announcement of Pandion's acquisition would have a significant positive effect on Pandion's share price – likely multiplying it by three – Markin and Wong put nearly all their available funds into the stock. *Id.* ¶ 17. Markin drained his checking account and then withdrew approximately $35,000 from his savings account to purchase more Pandion stock. *Id.* Wong told Markin that he was investing all of his money, was going to sell all of his other stocks, take out a six-figure loan, borrow against his life insurance, take money from his mother, and use cash he received in red envelopes for Chinese New Year to purchase more Pandion stock. *Id.* Markin and Wong also agreed that they would tell their family members and friends about the stock, and both did so. *Id.* ¶ 18.

For example, in February 2021, Wong told his brother, Brian Wong, that Pandion was going to make an "announcement" that was not "public info" but was "big news," and that the share price was going to "🚀" upward. PSR ¶ 17. Brian Wong purchased thousands of shares, and also told several friends to purchase Pandion shares. *Id.*

Markin also told multiple family members to purchase Pandion shares. For example, in February 2021, Markin told his relative to purchase Pandion shares. *Id.* On February 14, 2021, the relative told Jonathan Becker ("Becker") to purchase Pandion. *Id.* The same day, Becker texted a friend that "A new opportunity has emerged . . . with insider info." *Id.* Beginning on February 16, 2021, the first day the stock market was open after Becker learned about Pandion from Marin, Becker began purchasing thousands of shares of Pandion. *Id.* Becker also tipped a friend and a relative about Pandion. *Id.*

In total, Markin and Wong together caused at least 20 people to trade in Pandion stock based on the material non-public information that Markin misappropriated from his girlfriend, resulting in millions of dollars of illegally obtained trading profits.

### C.      Profits from Pandion Illegal Trading

After Merck's acquisition of Pandion was announced publicly, and the Pandion stockholdings of Markin, Wong, and those whom they tipped, significantly increased in value, Markin and Wong sold their shares of Pandion for significant profits. PSR ¶ 19. In total, Markin and Wong, together, purchased more than 35,000 shares of Pandion stock based on material non-public information that Markin had misappropriated from his girlfriend. Ind. ¶ 19. Markin and Wong also caused their family members, friends, and acquaintances, directly and indirectly, to purchase more than 26,000 shares of Pandion. *Id.* On or about February 25, 2021 and later, after the news of Pandion's acquisition became public, Markin sold the majority of his Pandion shares and made more than $80,000 in net profits from his insider trading. PSR ¶ 19. Wong also sold all of his Pandion shares after the acquisition was made public and made more than $1.3 million in net profits from his insider trading. *Id.*

After Wong sold his Pandion stock, he told Markin that he was going to "call up my Rolex man" and tell him "I want matching panda watches."  Ind. ¶ 20. Wong subsequently purchased two Rolex watches for himself for approximately $55,000, and a Rolex watch called the "Panda" for its design and coloring, which he presented to Markin as a thank you gift for the Pandion stock tip, and that was valued at approximately $40,000. *Id.*; PSR ¶ 19. Wong also told Markin "all the vacations are on meee [sic]," and paid for expenses during a trip to Hawaii for both of them where they stayed at luxury hotels. Ind. ¶ 20. Wong also treated Markin to a tasting menu at a three-Michelin-starred restaurant in Brooklyn, New York, that cost more than $1,000 for the meal. *Id.* Using his illicit insider trading profits, Wong also purchased a home in Florida. *Id.*; PSR ¶ 18.

### D.     Efforts to Conceal their Illegal Trading

To conceal their illegal insider trading scheme, Markin and Wong used an encrypted messaging application and deleted many of their text messages with each other. PSR ¶ 20. They also agreed on a cover story that they could provide to law enforcement, namely, that if they were asked how they anticipated Pandion's stock price increase, they could say they "read it on Stocktwits," a social media platform for sharing stock ideas, and falsely say that the news was "publicly being announced there." *Id.*

On November 18, 2021, in connection with a judicially authorized search, Wong was interviewed by special agents with the FBI, and spoke with them voluntarily without counsel present. Dkt. No. 136 at 7. Wong began the interview by explaining his trading through a version of the cover story that he and Markin had discussed. *Id.* Those statements were false. *Id.* After being advised that it is a crime to lie to federal agents, Wong admitted that he engaged in insider trading with Markin. *Id.*

After the public announcement of the Pandion acquisition, FINRA launched an inquiry into trading in Pandion stock, and asked the law firms that worked on the acquisition whether any of the names on a list of people who had placed well-timed trades in Pandion stock were recognizable. Markin's girlfriend, who by then was no longer dating Markin, noticed Markin's name on FINRA's list of traders and called Markin to ask him whether he had traded in Pandion stock. PSR ¶ 21. In response to her questions about the FINRA list, Markin falsely told her that he did not trade in Pandion stock and that FINRA must have been referring to a different person named "Seth Markin" who also lived in Falls Church, Virginia, where Markin maintained an apartment. *Id.*

In or about November 2021, Special Agents from the FBI interviewed Markin in connection with an investigation they told him was being conducted by law enforcement in the

Southern District of New York relating to insider trading in Pandion stock. *Id.* ¶ 22. During the interview, Markin adhered to the fake cover story he and Wong had concocted, and falsely told the agents (i) that he learned about Pandion on StockTwits, (ii) that he purchased the stock because of a recent earnings report and a new board member addition, and (iii) that he did not know that his former girlfriend worked on the Pandion transaction. *Id.*

### E.    The Nature of the Misappropriation and Attempts to Steal Additional Non-Public Information

As described above and in Markin's sentencing submission, FBI agents interviewed Wong on November 18, 2021. *See* Dkt. 149 at 14. In his sentencing submission, Markin, relying on a report of Wong's interview, marked and submitted as Exhibit I to the defense sentencing memorandum, argues that:

> Wong first offered a false account of having learned about Pandion stock by performing Internet research. Then, immediately after having been advised that lying to the FBI was a felony, Wong changed his tune and began to claim, inter alia, that Markin had provided him with information regarding Pandion stock after having reviewed the binder "multiple times." ([Exhibit I] at p. 3). However, during the very same interview, Wong stated that Seth Markin was never alone in the Associate's apartment. (Id. at 6). Wong then "speculated" that Markin looked at the binder when the Associate was in the shower or not in the room. (Ibid.).

Dkt. 149 at 14; *see also* Dkt. 149-9 (Exhibit I (Defense Exhibit, FBI 302 of 11/18/2021 Brandon Wong Interview)).[2] As reflected in the defense's Exhibit I, during that interview, Wong also stated, among other things, the following, in sum and substance:

- Markin saw a binder on his then-girlfriend's table in her apartment that referenced Pandion, which stuck out to him, and so he looked through the binder when his then-girlfriend, who had not provided Markin with permission to go through the binder, was not present;

---

[2] In response to the Court's March 1, 2024 Order, Dkt. 150, the Government has no objection to the defendant's February 28, 2024 request, Dkt. 148, to file certain portions of the defendant's sentencing memorandum and exhibits either in redacted form or under seal.

- Markin told Wong that he went through the binder without his girlfriend knowing, and that the information in the binder was insider information;

- From reading through the binder, Markin learned that Pandion was going to be acquired by Merck, that the deal was a sure thing that would lead to an increase in the stock price, and that the stock price was agreed on and there was an estimate of what it would be;

- The Pandion deal was delayed from the initial timeline in the binder, which Markin reviewed multiple times;

- Markin conveyed that his then-girlfriend would "kill him" if she had known that Markin went through the Pandion binder;

- Wong and Markin knew that the information pertaining to Pandion being acquired by Merck was not available to the public;

- Markin and Wong communicated about Pandion primarily through Signal and took steps to cover up any incriminating messages, including by leveraging the disappearing messages feature in Signal; and

- After the Pandion deal, Markin told Wong that he (Markin) saw a binder related to another deal that his girlfriend was working on, that the deal in the second binder was a dud and fell through, and that Markin tried to look for other binders while in his girlfriend's apartment.

Dkt. 149-9 (defense Exhibit I).

Text message communications between Markin and Wong in the month after the Pandion announcement show that Markin intended to continue to misappropriate non-public information from his then-girlfriend. For instance, on February 26, 2021, Markin texted Wong about potential insider trading on another stock, a Japanese pharmaceutical company. Markin's girlfriend had begun working on a confidential assignment concerning the company. Markin wrote to Wong, "This time around we go all in…."  Wong responded, "😱 all in for The japanese thingy?"  He added, "we need to have 100% certainty for that, I'm scared to do another all-in in my life." Markin replied, referencing Pandion, "that was a once in a life time."  Then, in a reference to his girlfriend, Markin texted, I was just reading over emails for her on the [Japanese company] case … Lol

nothing too heavy yet." Markin added, "Lol don't worry. We'll find something and make bank off it again."

In other text message communications with Wong after the Pandion deal, Markin described his then-girlfriend frequently in derogatory terms, and discussed "get[ting] her drunk" so that Wong could "talk to her about work."

### F.   Procedural History

Indictment 22 Cr. 395 (ER) (the "Indictment") was filed on July 21, 2022, and charged Markin with one count of conspiracy to commit securities fraud and tender offer fraud, in violation of 18 U.S.C. § 371 (Count One); eight counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5, 240.10b5-1, and 240.10b5-2, and 18 U.S.C. § 2 (Counts Two through Nine); securities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (Count Sixteen); tender offer fraud, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. §§ 240.14e-3(a) & 240.14e-3(d), and 18 U.S.C. § 2 (Counts Seventeen through Twenty Four); and false statements, in violation of 18 U.S.C. § 1001(a)(2) (Count Thirty-One). Markin was arrested on July 25, 2022 and released on bail conditions the same day.

On December 4, 2023, the defendant pled guilty, pursuant to a plea agreement, to Count Two of the Indictment.

### G.   Presentence Investigation Report

Using the November 1, 2023 Guidelines Manual, the Probation Office, consistent with the plea agreement, concluded that Markin has a total Guidelines offense level of 19, calculated as follows:

1. Pursuant to U.S.S.G. § 2B1.4, the base offense level for the offense is eight.

2. Pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(I), because the gain resulting from the underlying offense, insider trading, was more than $1,500,000 but less than $3,500,000, 16 levels are added.

3. The base offense level for the underlying offense governed by U.S.S.G. § 2B1.4(b)(1) is therefore 24.

4. Pursuant to U.S.S.G § 4C1.1(a), two levels are deducted, because, based upon the information now available to this Office (including representations by the defense), the defendant qualifies for an adjustment for certain zero-point offenders.

5. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

PSR ¶¶ 32-40. The defendant has no criminal history points and is in Criminal History Category I. *Id.* ¶ 45. Accordingly, the defendant's applicable sentencing Guidelines range pursuant to the November 1, 2023 Guidelines Manual is 30 to 37 months' imprisonment.

The Probation Office recommended a sentence of 15 months' imprisonment, to be followed by three years of supervised release. PSR at 27. In making its recommendation, the Probation Office noted: "Markin stole inside information, significantly profited from the illegal trades, attempted to destroy and conceal evidence, and provided false statements to law enforcement. His actions reveal that he was well aware of his illegal conduct when he engaged in the instant offense." *Id.* at 27.

## APPLICABLE LAW

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## DISCUSSION

Starting with the applicable Sentencing Guidelines range, and taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of his offenses,

Markin's efforts to conceal and minimize, the need to avoid unwarranted sentencing disparities, and the importance of general deterrence, a custodial sentence in the applicable Guidelines range of 30 to 37 months, in line with the sentences imposed on other insider traders in this District, and substantially higher than the other defendants in this case, would be sufficient but not greater than necessary to satisfy the purposes of sentencing.

### A. A Guidelines Sentence Is Necessary Because of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment for the Offense.

The nature and seriousness of the offense and the need to provide just punishment and promote respect for the law warrant a significant sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). There are several elements of Markin's conduct that render his criminal conduct serious and require punishment: the abuse of trust and exploitation of a close personal relationship; multiple trades based on insider information over several weeks, indicating it was not a momentary lapse of judgment; tipping of multiple individuals; the expressed desire to commit the offense again; efforts at concealment and obfuscation; and minimization of his conduct.

First, the harms caused by Markin are serious. While professing an interest in becoming involved in law enforcement, he won the trust of a woman who he ended up living with. Once he had created a relationship of trust, Markin exploited it for personal gain. While his girlfriend trusted Markin to be in their shared home unsupervised, and spoke to him about her job with the understanding he would maintain her confidences, he abused and exploited that trust. The result was not just that he victimized his then-girlfriend, who suffered consequences in her professional life. He also victimized the law firm, which had its confidences undermined—an outcome that the Second Circuit recognized in *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), could cause

harm to a firm's reputation. And it also victimized the law firm's client, whose confidences were misappropriated.

The defendant's insider trading also caused harm to the market by eroding people's confidences in the fairness of the stock market. As this Court explained at Brandon Wong's sentencing:

> Our markets are such an important part of our society, of our way of life, of the way that we go about our business, our everyday business, how we plan our lives, how we think about how long we are going to work and when we are going to retire, it is such an important part of the fabric of our economic life that to the extent that we are able to seek out and punish those who would hurt the integrity of that system, we have to do so.

January 26, 2024 Brandon Wong Sentencing Tr. at 24. That harm is particularly acute here since the defendant was attempting to become a member of the FBI. While the conduct occurred before Markin began his FBI training, the perception that a person who was training to be an FBI agent was not playing by the rules and lied about his conduct has the potential to damage the integrity of the financial system.

Second, the defendant tipped several individuals, including family members and friends, like Brandon Wong. The defendant takes issue with the Government's past characterizations of the defendant as the top of a tipping pyramid, arguing that the description ignores the history and characteristics of the defendant. Dkt. 149 at 1, 15. But while the pyramid may not represent all of the aspects of the defendant's life, it does accurately convey an important point: he was the single source of the misappropriated inside information, and he was the sole tipper that triggered several tipping chains. Put another way, without Markin, no one else would have traded on insider information. That is, after all, why Markin is responsible for the insider trading gains of others. The facts that Markin was the originating source of the misappropriated information and so much

money was gained through insider trading are aggravating factors the Court should incorporate into its sentence.

Third, the defendant did not engage in merely a single instance of insider trading, like defendants in other cases, or as some of the tippees in this case did. Rather, upon getting the confidential information, he repeatedly executed trades based on non-public information. Multiple trades over a period of several months demonstrates that this was not a momentary lapse of judgment. In other words, he repeatedly chose to do something he knew was wrong, week after week.

Fourth, as discussed above, even after he profited on the sale of Pandion stock, the defendant expressed an interest in misappropriating more non-public information from his girlfriend so that he and Wong could profit again. That demonstrates that but for the intervention of law enforcement, the defendant was primed to engage in insider trading again if the opportunity presented itself. Importantly, much of the defendant's sentencing submission relates to how he purportedly stumbled into insider trading. But his conversation with Wong after the fact, about doing the crime again, demonstrates his actions on Pandion were not mere mistakes or accident.

Fifth, unlike every other defendant the Court has sentenced in this case (who at most, like Wong, started lying before coming clean), the defendant here repeatedly attempted to conceal and lie in an effort to avoid criminal investigation. As discussed above, the defendant provided his ex-girlfriend with a false answer, which she supplied to FINRA. Then, when he was approached by the FBI, as discussed above, the defendant gave another false answer about where the information came from for his Pandion trades. These statements reflect efforts to conceal his conduct from law enforcement, which further amplifies the seriousness of the offense and demonstrates an absence of a respect for the law.

Sixth, the defendant's plea allocution—which occurred after he had an opportunity review other witnesses' statements—shows a continuing effort to minimize his own conduct. To be clear, the defendant's plea was legally sufficient, which was why the Government did not ask the Court to make further inquiry at that time. But legal sufficiency is not the same as fully accepting responsibility. And there are several aspects of the defendant's plea and his sentencing submission that evince minimization and a failure to fully accept responsibility. Take, for example, the defendant's explanation that he was helping his girlfriend unload some boxes and just happened to see some pages. The evidence at trial would have established, through FBI fingerprint analysis, that the defendant's fingerprints were on multiple pages—it didn't just fall open. And Markin's suggestion that he was, in essence, an accidental criminal is belied further by his crass and even crude descriptions of his own conduct in text messages with his co-conspirator, the repeated nature of his conduct, and his relishing in the illicit proceeds he gathered. Likewise, Markin's explanation that his girlfriend sometimes spoke about her work does not in any way excuse his conduct. Quite the opposite, it is because they had a relationship of trust and confidence that the defendant's girlfriend was willing to talk to the defendant about things that she would not have otherwise shared. He was not free to share or trade on the information she shared; her expectation, reasonably, was that he would be respectful of the relationship and maintain her confidences. The defendant's blaming of others in his sentencing submission evinces an inability to fully take responsibility for what he did and the implications of it.

Also inconsistent with the evidence is the defendant's claim that he was willfully blind and his investments were the product of research and piecing things together. The text message evidence, discussed above, shows that the defendant was supremely confident from the beginning of his conversations with Wong, repeatedly declaring they were "not uncertain," sharing details

16

about the transaction like timing and price, and expressing enthusiasm for how high the price would go. Indeed, if the defendant was not repeatedly violating his relationship of trust, there would have been no way for him to update Wong that the hold up on the announcement was the CEO of one of the companies needing to sign. In sum, the defendant's plea on a willful blindness theory minimizes the certainty and willfulness he had when he was engaging insider trading in Pandion stock.

### B.      A Guidelines Sentence Is Necessary for General and Specific Deterrence.

Against the backdrop of Markin's attempt to minimize his conduct, and his attempts to cast aspersions on others—for example, his former girlfriend and Wong—a significant sentence of imprisonment is also necessary in this case to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). In terms of specific deterrence, while Markin is a first-time offender, a significant prison sentence plays an important role in deterring future recidivism and Markin's conduct and lack of respect for others and the law make clear that recidivism is a palpable concern for this defendant. Markin engaged in sustained dishonesty with his then-girlfriend, with whom he lived, even prolonging the relationship to further his insider trading scheme. Markin did not hesitate to concoct a false alibi or to put into action and lie directly to law enforcement officials. Even when caught and brought before the Court under oath, Markin's plea allocution, while legally sufficient and certainly demonstrating a level of acceptance of responsibility, minimized his knowing participation in this scheme. And his sentencing submission makes clear that he does not fully appreciate the seriousness of his criminal conduct, only underscoring the need for a significant term of imprisonment to deter him from future criminal conduct. Indeed, his communications during the course of his conduct make abundantly clear that he was willing to violate the law and take steps to thwart law enforcement, including deleting key communications,

concocting a cover-up story, and then lying directly to law enforcements officers. His text messages, discussed above, also demonstrate an interest in committing insider trading again.

This is not a case like so many where courts express a belief that specific deterrence is unlikely to be important. Here, there is substantial reason to believe that Markin would be willing to circumvent the law again without a sufficient deterrent. There are many examples of first time white collar criminals in this district who at the time it may have seemed unlikely that they would reoffend, but they become recidivists. *See, e.g.*, *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having serving a prior two-year sentence for bank and wire fraud); *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme). A term of incarceration is necessary to ensure that this particular defendant does not undertake insider trading or another form of fraud in the future.

The need for general deterrence also calls for a substantial Guidelines term of imprisonment. The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is an important sentencing factor in fraud and white collar cases because the decision to commit fraud is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and

fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). In particular, as the Second Circuit and courts in this district have noted, significant sentences are necessary for insider traders who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). Indeed, research shows that enforcement actions and punishment for insider trading is effective for achieving deterrence. *See, e.g.*, Fernan Restrepo, *The Impact of Insider Trading Doctrine on the Incidence of Insider Trading: An Analysis of the Effect of the Misappropriation Theory* (Nov. 8, 2023), https://ssrn.com/abstract=4627327 (finding that the adoption of the misappropriation theory of insider trading had a meaningful deterrent effect); Robert Davidson and Christo Pirinsky, *The Deterrent Effect of Insider Trading Enforcement Actions*, Accounting Review (May 2021) (concluding that insider trading convictions have a statistically significant effect on deterrence of future insider trading).

　　For those reasons, it is important here to impose a significant sentence to deter future insider trading. The defendant profited more than $80,000 and, together with Wong, caused at least

20 other people to trade in Pandion, resulting in millions of dollars of illegally obtained trading profits; he actively misappropriated information that he obtained through his close, personal relationship with his former girlfriend; as evidence by the deletion of communications with Wong, the illegality of his conduct was clear to him; he showed an interest in continuing to misappropriate information stolen from this former girlfriend and engage in additional insider trading; he concocted a cover story; and he used that cover story, lying to the FBI.

Imposing the five-month sentence of incarceration that Markin seeks would send the regrettable message to would-be insider traders that, even if caught and prosecuted to conviction, no matter how brazen the conduct is, how much profit is made, or how many people are tipped, the penalties are not serious. Without a significant sentence, the calculus for future insider traders will continue to be that the certainty of large profits outweighs the marginal risk of detection and subsequent incarceration.

### C.     A Guidelines Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities.

Finally, the Court must consider the need to avoid unwarranted sentencing disparities. Comparing Markin's conduct to that of other similar insider trading defendants in this Circuit and throughout the United States reveals that a sentence in the Guidelines range is sufficient but not greater than necessary to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Starting with the other defendants in this case, Markin is more culpable than Brandon Wong, Brian Wong, and Jonathan Becker. He directly misappropriated the material, non-public information he obtained through his relationship with his former girlfriend; he contrived the scheme and a false cover story; and he tipped multiple people directly. As the Court observed at the sentencings of other defendants in this case, Markin and Wong are not "in the same category

as either Mr. Becker or Mr. Brian Wong," and for that reason, their conduct warranted sentences significantly longer than those co-defendants. (Dec. 19, 2923 Sent. Tr. at 19.)   Then, when comparing Wong to Markin, Wong demonstrated immediate acceptance of responsibility, attempted to cooperate with the Government, and was not the primary misappropriator in the scheme. As the Court recognized at Wong's sentencing, Markin is relatively more culpable.

As compared to other insider trading defendants in this district, a Guidelines sentence is appropriate. Courts in this district have repeatedly sentenced individuals convicted of insider trading to terms of incarceration. *See, e.g., United States v. Stone*, No. 22 Cr. 510 (MKV) (defendant sentenced to 28 months' imprisonment following guilty plea); *United States v. Bhardwaj*, No. 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment following guilty plea); *United States v. Dikshit,* No. 21 Cr. 760 (CM) (defendant sentenced to 24 months' imprisonment following early guilty plea); *United States v. Polevikov*, No. 21 Cr. 774 (LJL) (defendant sentenced to 33 months' imprisonment following pre-indictment guilty plea); *United States v. Malnik*, No. 19 Cr. 714 (VM) (defendant sentenced to 30 months' imprisonment following guilty plea); *United States v. Collins*, No. 18 Cr. 567 (VSB) (defendant sentenced to 26 months' imprisonment following guilty plea).

Accordingly, in order to avoid unwarranted sentencing disparities, the Court should sentence Wong to a substantial sentence, at or around the bottom of the applicable Guidelines range, which is consistent with the average sentence for similarly situated defendants in this District.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence in the applicable Guidelines range of 30 to 37 months' imprisonment would be sufficient but not greater than necessary in this case.

Dated: New York, New York
      March 6, 2024

                Respectfully submitted,

                DAMIAN WILLIAMS
                United States Attorney

       By: _____/s_____
                Nicolas Roos
                Negar Tekeei
                Assistant United States Attorneys